MAHONEY *v.* VAN WINKLE *et al.*

A GENERAL objection to the form of a verdict, without any specification of the particulars in which it is alleged to be defective, will not be considered.

A decree of the United States District Court, confirming a claim under a Mexican or Spanish grant, which has become final by the refusal of the Government to prosecute an appeal therefrom, and by stipulation of the District Attorney, settles forever the question of the validity of the grant.

A confirmee of a Mexican grant, after a decree confirming to him a specified quantity within exterior limits, fixed by the grant, embracing more than the quantity confirmed, may maintain, until an official segregation is made, ejectment, for any portion of the land embraced within the exterior limits against one in possession claiming to be a preëmptioner under the laws of the United States.

Where a Mexican grant cedes a tract of land known by a particular name and specifies, in pursuance of the grantee's petition, that a certain quantity is embraced within the limits of the tract, and also that any surplus above the specified quantity which, upon a survey and measurement by the Government, may be found within its boundaries, is reserved for the benefit of the nation; such grant vests in the grantee the right to the possession of the entire tract until by an official measurement and survey it has been determined that a surplus exists and the limits of the specific quantity granted are established.

The grantee cannot, in such case, himself make the measurement and segregation, but must await the action of the Government. He is therefore directly interested until the official segregation to protect the entire tract from waste and injury, and to improve it; and until then third persons cannot question his right to the possession of the whole.

Until the official segregation of the specific quantity granted, the entire tract within the exterior boundaries of the grant is exempted from preëmption and settlement by the legislation of Congress.

Under the Mexican law the segregation was effected by delivery of juridical possession which could only be made after the approval of the concession by the Departmental Assembly, and was therefore often delayed for years, yet in California the grantee took possession at once upon the issuance of the grant, and his possession was respected both by the authorities of the Government and adjoining proprietors.

Mahoney *v.* Van Winkle.

Where a Mexican grant cedes a specified quantity within a larger area, a selection and location of the specific quantity may be made by the grantee under such circumstances, and accompanied with such disclaimers, as to estop him from the assertion of any title or right to the possession of the remainder, existing within the exterior boundaries of the general tract, until by the action of the Government it is determined that his claim under the grant shall be satisfied by land elsewhere selected.

There is nothing in the nature of a colonization grant prohibiting the grantee from restricting his general right to the possession of the entire tract. And when the grantee selects his location and quantity, uses it, leases it, sells or mortgages it, and disclaims title to the remainder, the selection is obligatory on him until the Government overrules his election and assigns him the land elsewhere.

In an action of ejectment the plaintiff showed that the premises in controversy were part of a tract called Laguna de la Merced, which, in 1835, was granted by the Mexican Government to one Galindo upon a petition representing the tract to be a league in length and a half of a league in width more or less; that the grant reserved to the nation any surplus that might be found above this quantity; that Galindo and his successors in interest had possessed the entire tract, which embraced a surplus, until 1853; that they had obtained from the United States tribunals a decree confirming to them the land, to the extent of the quantity specified, to be selected within the boundaries of the general tract; that no official segregation had been made of this quantity by either Government, and that plaintiff was a purchaser from the confirmees. The defendants claimed that their possessions, though within the tract, were outside of a selection which they alleged had been made by plaintiff's grantors in such manner that they and he were estopped from claiming the balance. To show this defendants offered to prove that previous to June, 1853, the lands occupied by them had been "townshiped and sectionized" like other public lands of the United States; that in September, 1853, the grantors of the plaintiff caused a survey to be made of the specific quantity designated in the grant; that the claimants under the grant assented to such survey when made; that afterwards *some* of the grantors sold, mortgaged, and leased portions of the lands lying within the survey, and to the defendants and others publicly disclaimed having any title to or interest in the residue of the general tract; that acting under such disclaimers and acts of *some* of the said grantors they made their locations; and that they were not within the lines of the said survey. The Court, on objection of plaintiff, excluded this testimony, and on appeal: *Held,* that the evidence offered did not tend to prove an estoppel or a selection binding on the plaintiff, and was therefore properly excluded, three of the claimants (who were seven in number) being at the time infants, and two of them being under the disability of coverture.

Infants and married women are incapable of giving any binding assent to a restriction of their rights to land claimed under a Mexican grant, or of making any disclaimers in respect to such rights which will bind them as an estoppel.

No action of a portion of several tenants in common can impair the rights of their co-tenants.

36

No party but the Government can question any selection made by the grantee under his grant. As against all other parties it is sufficient for the grantee to show that the land selected lies within the boundaries designated in the grant. But to restrict the possessory right of the grantee to the selection made, the selection must be accompanied with such disclaimers as to the residue of the general tract as to operate as an estoppel upon him.

A survey made by the Surveyor-General of the United States for California to establish the location of a confirmed grant, under the Act of Congress of 1860, is of no binding force until it has become final in one of the modes pointed out by the act. Until then it is only a preliminary proceeding, not binding either upon the Government or the claimant.

A tenant in common of an undivided portion of a tract of land is entitled to the possession of the whole tract as against all persons, except his co-tenants, and as a consequence may, as against all others, maintain ejectment for the entire premises. *Touchard* v. *Crow* (20 Cal. 150) affirmed on this point.

Per NORTON, J.—That a Mexican grant, ceding a specific quantity of land within exterior boundaries embracing a larger quantity, conveys a title upon which an action of ejectment, for at least the quantity specified, may be maintained, has been several times decided by this Court, and must be considered as settled so far as the question depends upon the judgments of the State Courts. If before a juridical survey the grantee can recover any particular portion, he can recover the whole.

APPEAL from the Twelfth Judicial District.

In 1835, José Antonio Galindo petitioned the proper Mexican authority for a concession of a tract of land called the "Laguna de la Merced," situated within the limits of the present counties of San Francisco and San Mateo. In his petition he stated that the tract solicited was a league in length and half a league in width, more or less, and referred to an accompanying map as showing the boundaries. After a compliance with the required forms, a grant was issued to him containing the usual conditions of grants in colonization and reciting that "The land of which mention is made is a league in length by half a league in width, and is equal to one-half a league square as shown by the map attached to the *espediente.* The Judge who may give the possession will cause the same to be measured in accordance with the ordinance, the surplus (*sobrante*) which may result to remain to the use of the nation."

Galindo immediately entered into possession, and soon after built a house and corral near the southern line, which he occupied for a year or two, and then sold and conveyed his title to Francisco de Haro. De Haro then moved his family into the house built by

Galindo, and also built another house near the same spot, which he occupied for a time; after which he built another house, further towards the north, at the south-eastern extremity of Lake Merced, into which he moved his family, and there continued to reside until his death, which occurred in 1848 or 1849; his cattle in the mean time straying over the ranch for pasturage. De Haro died intestate, and his estate descended to his seven children, only two of whom were adults.

In 1852 a petition was presented in the name of the heirs, to the Land Commission, for a confirmation of the title, which by the decree of that body, and afterwards on appeal by the United States District Court, was confirmed. The decree of the latter tribunal became final by the refusal of the Government to prosecute an appeal therefrom, and by the stipulation of the District Attorney.

This decree declared that the land confirmed was known as the Laguna de la Merced, and was "of the extent of one-half a square league, being one league from north to south, and a half league from east to west, to be located according to and within the calls of the original grant." No partition of the premises was ever made between the heirs of De Haro.

The plaintiff, Mahoney, at different times between 1858 and 1861, and before the commencement of this action, purchased from five of the heirs their undivided interests and relies upon the title thus acquired. The action is ejectment, and the defendants, twenty-one in number, answered separately; some of them simply denying the allegations of the complaint, and others, in addition to this denial, setting up title in themselves to specific parcels of the premises as preëmptioners under the laws of the United States, and each of them demanded a separate verdict.

On the trial, the plaintiff having rested on proof of the facts substantially as above stated, the defendants, for the purpose of showing title in themselves and that the plaintiff was estopped from claiming the land occupied by them within the Laguna de la Merced, made an offer of proof which is stated in the record as follows: "Defendants then offered in evidence a certified copy of map from the Surveyor-General's Office of the State of California with field

notes, dated twenty-ninth of June, Anno Domini one thousand eight hundred and fifty-three, showing that before that time, the land of the various defendants claiming title under the United States, as set out in their answers and stipulation, had been by the United States *townshiped and sectionized* like other public domain of the United States.  Also, in connection therewith, the various preëmption claims, bounty, school, and seminary land warrants with proof of location and improvements as set out in the various answers of the defendants, and proposed to follow up said offer by proof that the grantors of the present plaintiff, and through whom he claims, did, on the twenty-second day of September Anno Domini one thousand eight hundred and fifty-three, have made and completed a survey of the half league square within the exterior boundaries contended for by plaintiff, and proposed to follow it up with proof of the assent of claimants upon its being made according to that survey, and that none of these defendants nor their claims are within the lines of that survey, and that since said survey had been so made and completed, *some* of the grantors aforesaid of this plaintiff have, within the lines of said survey, sold portions thereof to third persons, mortgaged other portions and leased other portions thereof, and that they have constantly and publicly to these defendants and others, before these defendants made their locations, disclaimed having any title or interest in the balance of the land lying within the boundaries of the rancho claimed by plaintiff. And acting under such disclaimers and acts of *some* of the grantors of the present plaintiff and the United States, these defendants made the locations aforesaid and have since made large and valuable improvements upon said lands.  And also offered to prove by competent proof that under the final decree of confirmation of this grant, as introduced by plaintiff, the Surveyor-General of the State of California did truly and legally make the survey of this grant, and did plat the same, and did on the eighteenth day of June, Anno Domini one thousand eight hundred and fifty-nine, examine and approve of the same, and the same was on that day filed in his office as the final survey of said rancho.  A certified copy of said survey with map and field notes was also offered in evidence.  And that afterwards and before the commencement of

this suit, said survey was ordered into the United States District Court for the Northern District of California for revision under the Act of Congress relative to surveys of Mexican Land Grants of California, approved fourteenth of June, one thousand eight hundred and sixty, under the exceptions and objections of the United States District Attorney and those of the defendants, included within the lines of said survey, but not by plaintiff, and is there now so pending; that the plaintiff has appeared in said proceedings to defend said location, and that the possession and locations of the balance of these defendants are entirely without the bounds of said last named survey." *In connection with this offer, it was conceded that at the time of the making of the survey in* 1853, *three of the heirs were minors and two others of them were* femme coverts.

To the proof offered the plaintiff objected, on the ground that it was irrelevant and constituted no defense. The Court sustained the objection, and defendants excepted. The Court instructed the jury to find generally a verdict in favor of two of the defendants, and " a separate verdict against each of the other defendants for the land described in the complaint, without specifying the particular description of the land " of which each defendant was in possession. The verdict rendered contained the names of all the defendants arranged in a column, and opposite two of them, connected by brackets, was written " for defendants," and opposite fourteen others, also connected by brackets, the words " for plaintiff for land as described," and opposite the other five "for plaintiff," and at the bottom the words : " We, the jury in the case of *Mahoney* v. *Van Winkle et al.,* find a verdict as above." The minutes of the Court, immediately after stating the rendition of this verdict, contain an entry as follows : " Whereupon defendants by their counsel excepted to the form of the verdict."

Judgment was rendered in accordance with the verdict. Defendants moved for a new trial, which was denied, and from this order and the judgment the appeal is taken.

*J. B. Crockett,* for Appellants.

I.   The judgment and verdict are erroneous.   The defendants

were entitled to separate verdicts, and to a separate judgment, in respect to each defendant. This is not a mere matter of form, but affects a substantial right. If separate verdicts had been rendered, and separate judgments entered, each defendant would have been severally liable for his own portion of the costs, and for rents and profits pending this appeal, of the particular portion of the land held by him. ( *Greer* v. *Mezes*, 24 How. 268.)

II.    Upon the facts proved, or admitted, the plaintiff was not entitled to recover in ejectment. The cases of *Cornwall* v. *Culver* (16 Cal. 423) and *Riley* v. *Hirsch* (18 Id. 108) are those chiefly relied on by the respondent. But neither of them sustains the respondent's theory; on the contrary, the latter case is directly hostile to his position. It is claimed by respondent's counsel, on the authority of these and other prior decisions, that under a concession made by the Mexican Government of a smaller quantity within a larger area, without a judicial measurement, and without any proof of actual possession of the land in contest by the grantee, he can maintain ejectment by force of the concession alone against trespassers for all the land within the exterior limits. This Court has never so decided, nor does the point arise in this case. The question here is whether the claimants, after making the "temporary selection and location," referred to by this Court in the case of *Riley* v. *Hirsch*, and after dealing with it as if in full property, by leasing, selling, and mortgaging it, and after disclaiming title to the remainder of the tract, can maintain ejectment against those who, under these circumstances, have in good faith purchased from the Government, and paid for the land they occupy, outside of the half league selected by the claimants. Whatever they may have claimed, and whatever acts of ownership may have been exercised over the general tract by Galindo or de Haro, it is evident that after the survey in 1853 the heirs claimed and exercised ownership over the half league only, and abandoned whatever right of possession they had as to the remainder, confining themselves to the half league alone.

The case of *Riley* v. *Hirsch* in its reasoning covers this case. In that case the Court lays particular stress upon the right of the grantee to make his temporary selection. It says: "It was com-

petent for the grantee himself to make a temporary selection and location, which would be binding and effectual as against intruders, and trespassers, and all parties, until the action of the Government in the matter." * * * " Such temporary selection and location are evidenced by occupation or cultivation of the land, its sale or lease, or any ordinary use by the grantee, according to the custom of the country." The Court considered the evidence in that case sufficient to establish the "temporary selection and location" of Sutter, and manifestly decided the case on that ground. But the Court did not assert, and I think did not intend to intimate, that after making his "temporary selection and location," he could have maintained ejectment for all the land outside of it. But in this case this is precisely the principle asserted by the District Judge, in whose opinion the temporary selection and location went for nothing, and in no degree impaired the plaintiff's right of recovery for the entire tract. The ruling of the District Judge covers the broad ground that, notwithstanding the temporary selection of the grantee, his use of the land selected, his sale, leasing, and mortgaging of it, and his disclaimer of possession and title as to the remainder, he may nevertheless recover all the remainder of the land by virtue of the grant alone. I deny that such recovery could have been had if there had been no selection; but when the grantee selects his location and quantity, uses it, leases it, sells or mortgages it, and disclaims title to the remainder, it is and ought to be obligatory on him until the Government overrules his election, and assigns him the land elsewhere. By this rule no hardship is imposed upon the grantee. He selects the quantity he is entitled to, and is protected in the enjoyment of it, pending his proceedings to perfect the title ; and if the Government repudiates his selection, and assigns him other lands, his title attaches to the new location. In this way exact justice is done to all. The grantee gets all the grant entitles him to, and settlers outside of his location are not disturbed, unless the Government, in the exercise of its sovereign right to segregate the lands of the grantee from the public domain, shall include their possessions in the tract finally awarded to the grantee, in which event their rights must of course yield to his. But on the plaintiff's theory, if the grantee makes his selection,

enjoys it, leases and sells it, he may eject all settlers from the general tract, not only before a survey, but even after an official, approved survey, pending in the District Court for review, not excepted to by the claimants, and which does not include a large number of the settlers sought to be ejected.

III.   The plaintiff is precluded by the official survey, and can claim no lands outside of it, unless it is set aside by the District Court, and a new survey ordered.   Before this suit was brought, there had been an official survey of the half league approved by the Surveyor-General.   This survey embraces a portion but not all the defendants.   It had been ordered into the District Court at the instance of the District Attorney, acting on behalf of the United States and of these defendants.   Exceptions to the survey were filed by the District Attorney, in pursuance of the Act of Congress of the fourteenth of June, 1860, and is still pending on these exceptions ; but no exceptions were filed by the claimants, and the time has long since elapsed within which such exceptions could be filed.   So far from excepting, the claimants are insisting on the survey as correct.   This fact appears in the case.   It is obvious, therefore, as the case now stands, that this official survey is obligatory on the plaintiff, and concludes his rights until it is set aside. He cannot be heard to impeach it, because, as to him, it has become final by operation of law.   So long as the survey stands, he is under a bar which precludes him from asserting title to lands outside of it. As to him, it is a final adjudication of his rights, unless the Court sets it aside.   If the District Attorney sees fit, he may at any time withdraw his exceptions, and the survey will then become absolutely final.   As far as relates to the plaintiff, it is final and obligatory now, because he cannot impeach it or gainsay it.   So long as this bar continues, he is stopped to claim any land outside of it.   It binds him as completely as a patent would do, so long as it remains in force.   If the patent had issued, and the Government had instituted proceedings to vacate it, no one will claim that during these proceedings the patentee could treat the patent as a nullity, and sue in ejectment on his original grant for lands outside the patent.   The patent limits his claim and defines it.   An approved official survey has precisely the same effect after the time has

expired within which the claimant could except to it.   Henceforth it limits and defines his claim until it is set aside ; and the proceedings in the District Court for reviewing the survey have no greater effect upon the claimant's rights in extending his claim than proceedings to vacate a patent.   But whilst the claimant is bound by the survey until set aside, it has no such conclusive effect as against the Government, or persons claiming under it, pending their exceptions to it.   As to them it is not binding until finally approved. But the claimants, having failed to except to it, are bound by it until set aside.

IV.   The defendants are not mere intruders without color of title.   Their lands were sectionized as public lands, and the defendants have purchased them from the Government, and paid for them. The Government officers and the defendants have been induced by the conduct of the claimants to treat these lands as part of the public domain.

The sixth section of the Act of Congress of March 3d, 1853, providing for the survey of the public lands in this State, authorizes preëmption claims to be located upon any of the public lands, whether surveyed or unsurveyed, with certain exceptions, amongst which are lands " claimed under any foreign grant or title." I contend that under this act all lands were *prima facie* liable to preëmption, except those in respect to which the claim of title, founded on a " foreign grant," was evidenced by the usual and ordinary acts of possession and ownership.   If the grantee did not see fit to reduce his lands to possession, or to exercise over them the ordinary acts of ownership, whereby the public might know what lands he " claimed," he exposed himself to the peril of having his lands preëmpted, in which event he could only recover the possession after his claim was finally confirmed and located by a survey.   The whole question resolves itself into a proper interpretation of the word " claimed," in the Act of March 3d, 1853. Does it mean simply to embrace all lands within the exterior limits of any grant, or does it mean only those lands which the grantee, under the law, is in fact entitled to, and his " claim " to which— prior to the final location—is evidenced by possession, or other usual acts of ownership ?   I think the latter is the proper interpre-

tation, in view of the condition of these titles at the date of the act referred to.

The grantees in this case selected their half league, reduced it to possession, leased, mortgaged, and sold portions of it, and have not been disturbed in the enjoyment of it. The defendants took up preëmption claims on the remainder of the tract, and are in possession under them. There has been no final survey of the grant. Are the preëmption claims absolute nullities, and void *ab initio*, or are they only voidable on condition that they are included in the final survey of the grant? It is plain to my mind that they are voidable only, and until the contingency happens they constitute a valid defense to this action. The defendants are not trespassers without title; on the contrary, they have a defeasible title, liable to be defeated on one condition only, to wit: that the lands are embraced in the final survey. This contingency has not yet happened, and until it does they are entitled to the possession.

V.    We also claim that Mahoney, as a tenant in common with a portion of the heirs of De Haro, cannot maintain ejectment for the whole tract. (9 Dana, 427; 10 Iredell, 446; 4 Burr, 2437; 6 East. 173; 11 Id. 288; 12 Id. 39; 3 Taunt. 120.)

*Walter A. Tompkins* and *Sol. A. Sharp*, for Respondent.

I.    Admitting, for the sake of the argument, that the verdict is erroneous, it ought not to be set aside, for the reason that there was no legal objection to it at the time of its rendition. It is true there was an objection to the form of the verdict. This is too general; it should have been specific, showing in what respect the form of the verdict is wrong. But the verdict is not erroneous. (*Perkins* v. *Wilson*, 3 Cal. 137; *Moody* v. *McDonald*, 4 Id. 297; *Little* v. *Larraber*, 2 Greenleaf, 37; *Burhaus* v. *Tibbits*, 7 How. Pr. 27.)

II.    Appellants contend that there was a right of preëmption within the exterior boundaries of a Spanish or Mexican grant; that is to say, when there was a grant of a smaller quantity within a larger one, which right was subject to be defeated by the approved survey and patent.

It is provided in the thirteenth section of the Act of April, 1851,

among other provisions, "That all lands, the claims to which have been finally rejected by the Commissioners, shall be deemed held and considered as part of the public domain of the United States." This section shows that the word "claims" embraced all claims of lands presented to the Commissioners, whether valid or invalid. Until the claim was rejected the land did not become public, and, therefore was not subject to preëmption.

In the Act of 1853, referred to by the counsel, reserving these lands from preëmption, the word "claimed" has the same meaning, viz.: those lands claimed, by presenting the same to the Commissioners. Congress no doubt intended to withdraw all of the lands claimed under foreign grants, from controversy. This is the plain letter of the law. But further than this, the whole extent of land within the exterior boundaries was claimed by possession; and, being thus claimed, is excepted from the operation of the preëmption laws of the United States and of this State.

It is conceded that this land was held in actual occupancy by the grantee and De Haro, for fourteen years. This is certainly a sufficient claim, if all others failed; and though he actually lived on and occupied but a part of it, his flocks and herds pastured over the whole. The language of this Court in *Cornwall* v. *Culver* (16 Cal. 413) is as follows: "Thus far, the United States have given no countenance to any intrusion upon this land; but, on the contrary, have expressly forbidden the assertion of any preëmption rights to it or to any lands similarly situated." (See, also, upon same question, *Riley* v. *Hirsch*, 18 Cal. 198–200; *Moore* v. *Wilkinson*, 13 Id. 489; *Biddle Boggs* v. *Merced Mining Co.*, 14 Id. 361–2.) We submit that this land within the exterior boundaries is exempt from preëmption, and, therefore, these parties can have no equities in the premises.

The simple question, then, is: Can these parties make a selection which will bind them, in favor of parties who are trespassers, without title or shadow of title? If a selection were possible, the acts of Galindo, as evidenced by his use, occupation, and sale of the land whilst the owner, was a selection, to all intents and purposes, of the half league of land (if confined to that quantity) including his improvements. If Galindo, having the right to make

a selection, did make a selection, would not the right of selection once exercised, cease ? and would not his selection, if binding on him, be equally so on his grantees, and all who are privy to his title ? We think, unquestionably ; because, if selection has any basis in the law, it is upon the principle of estoppel; and an estoppel of this nature, affecting the title to land, would run with the land, and bind all parties and privies to the title. De Haro would have taken nothing by his conveyance from Galindo except the half league of land so selected, nor would any other portion have passed to his heirs or to the present plaintiff. Counsel for appellants uses the phrase "temporary selection." We inquire, how temporary ? Is it certain or uncertain, as to time ? Can the party making the selection, or his successors in interest, change it ? If so, when, how often, and under what circumstances ? How is this right of selection limited ?

We submit the only rational answer to these interrogatories is, that no selection could ever be made until a final segregation of the private from the public land, either by a judicial measurement under the Mexican system, or a final survey under our Government; and when once made, cannot be changed, and is lasting as the landmarks of the country.

III. As to the alleged selection by the heirs in 1853. Francisco de Haro died in 1848 or 1849, leaving seven children. It is conceded that at the time of the survey of Ransom and the alleged selection by the heirs, three of them were minors under age, and the record shows that one is still a minor ; two were and still are married women. Ramon De Zaldo, it appears, acted then as administrator of De Haro's estate, and was guardian of two of the minors.

The offer of proof respecting a selection by plaintiff's grantors, in 1853, was properly ruled out : 1st. No selection could have been made to bind any of the heirs laboring under disability ; no act of the husband could bind as a selection the separate property of the wife, and no act of the guardian could bind as a selection the property of the minors. 2d. De Haro died during the operation of the civil law whereby the descent was cast without administration, and the property vested immediately in his heirs.

3d. De Haro's death having occurred prior to the passage of our Statute of Probate, his estate was not subject to administration, and De Zaldo's acts as administrator were and are void and unauthorized. 4th. The offer only extends to "some of the heirs," and it does not appear how many, or which—whether adults, minors, or married women. It does appear, however, that the only male adult, and the one who should have been consulted, had nothing to do with the selection.

The case of *Riley* v. *Hirsch* is cited to sustain this doctrine of temporary selection. We do not understand that case as deciding any such question. It is stated in that opinion of the Court that " it was competent for the grantee himself to make a temporary selection and location which would be binding and effectual as against intruders and trespassers and all parties until the action of the Government in the matter. * * Such temporary selection and location are evidenced by occupation or cultivation of the land, its sale or lease, or any ordinary use by the grantee according to the custom of the country." What would be " binding and effectual as against intruders and trespassers," is a matter widely different from that which would be binding and effectual in favor of intruders and trespassers. The one party has title ; the other party has no title, or color of title. The party having no right, cannot bind the party having the right.

These grantees and the United States were, at the time of this pretended temporary selection, and still continue, the only parties in interest within the exterior boundaries of this grant. The grantees have a vested interest in the specific quantity granted and the right to the possession of the whole tract until after the segregation. The United States are the owners of the overplus, which is to be determined by the segregation. The grantees have no power to make the segregation. This is the sole province of the United States. The segregation is a permanent selection. Admitting, for the sake of argument, that the grantees have equal authority with the United States to make a temporary selection, the United States is a necessary party to the selection, for the reason that the United States is the only party in interest, the only party that could be effected by the selection, and the only party that could bind or

be bound by the grantees. Estoppel is the only principle of law we can conceive, upon which the counsel can base this question of temporary selection, and it is clear that this case is wanting in all the essential elements of estoppel.

In relation to the suggestion of abandonment by the grantees of all outside of the pretended temporary selection, this Court has decided that the doctrine of abandonment of real estate only applies where there has been a mere naked possession without title. (*Ferris* v. *Coover*, 10 Cal.)

IV.   Another point made is, that the official survey is final as to us.   This survey was made by the Surveyor-General, in accordance with the law of 1851, subsequent, of course, to the confirmation. It is stipulated as a fact that the survey is not final.   It is undetermined, and undergoing judicial investigation in the United States District Court, but it is claimed that it is final as to us, because we have filed no exceptions.   It has been decided in all the cases in which the question has arisen in this Court, that the claimant has no power over the survey.   It belongs exclusively to the Government.   Prior to the Fossat decision, the Courts of this State uniformly held that an approved survey by the United States Surveyor-General was final, and equivalent to a patent.   I suppose the reason of these decisions was, that it was uniformly the practice of the Federal authorities to issue a patent upon an approved survey. Since that decision, this Court has gracefully yielded to the doctrine therein promulgated, viz.: that the District Court did not lose jurisdiction of the case until the issuance of the patent.   The law of June, 1860, was passed carrying out the Fossat decision, or, in other words, prescribing a mode for the adjudication of the surveys.

The subject matter in the proceeding prescribed by this statute is the survey.   The decree of the Court approving of the survey is the final adjustment of the matter.   There is no final disposition until the decree.   This is the only mode known to the law.   It is the final decree that affects all parties.   The decree is the judgment of the Court upon the matter before it, and until that decree there is nothing adjudicated, nothing determined or settled as final or binding upon any party.

V.   We do not deem it necessary to discuss the question of ten-

ancy in common raised by the counsel for the appellants.   It has recently received the construction of this Court, and we think it is not an open question in this State.   (*Touchard* v. *Crow*, 20 Cal. 150.)

*Wm. M. Pierson*, also, for Respondent.

I.   The facts offered to be proved by defendants, it is pretended, constitute such a temporary " selection and location " as will, if the theory of the conclusiveness of such selection and location be based on reason, restrict us to the precise boundaries of the survey made in 1853.   Do they establish such a selection ?   This Court has defined the evidences that may indicate a temporary selection and location ; and what are they ?—" Occupation and cultivation of the land, its sale or lease, or any ordinary use by the grantee, according to the custom of the country."   These acts, if confined to a specific tract, and exclusively to that tract, may establish such a selection and location of that tract as will confine the grantee to it until the interposition of the Government by a finally approved survey.   But the very core of the definition presupposes that these acts are restricted to the particular tract, and that they do not apply to the surplus land within the exterior boundaries.   The facts in the case at bar fall below the spirit of the definition.

It is further asserted, however, that some of the adult heirs and the guardians of some of the minors, leased, sold, and mortgaged a valuable portion of the lands embraced in the survey of 1853. If we are to be bound by a supposed selection and location, the primal elements of justice imperatively demand that that selection and location should be the act of all the parties interested.   No number of tenants in common less than all can perform any act in relation to the cardinal rights of property that can injuriously affect the interests of the remainder.   In the case at bar it is asserted that some of the parties interested sold, leased, and mortgaged a portion of the lands within the Ransom survey, and because those " some " chose to abandon, as counsel assert, their claim to property, the plaintiff, who is grantee of the " some " who did not so choose, as well as the grantee of the others, is silenced in the assertion of his rights to the unrelinquished residue.

But grant that all the parties interested united in those sales,

leases, and mortgages, what conclusion follows? Had they not the indubitable right to sell, lease, and mortgage any portion, or the whole of the tract? Because they sold, leased, and mortgaged land inside of the survey of 1853, did that *per se* operate as a restriction against performing those identical acts as to land outside the survey? And further, the offer of proof does not show that the parties who thus sold, leased, and mortgaged within the survey did not also sell, lease, and mortgage outside the survey. The selection, then, is neither shown to be exclusive in its character, acquiesced in by all the parties in interest, or consisting of those emphatic acts which the spirit of the definition of this Court unequivocally requires.

II.   Admitting for argument sake, however, that the parties interested have made a temporary selection and location of their specific half league, and that the same comprised all the elements of fact that could be essential to the perfect application of the principle, still that selection and location are not conclusive on the grantee to the extent that he is debarred from recovering in ejectment lands located outside of it, but within the exterior boundaries, until the action of the Federal Government in segregating his specific quantity from the public lands. It cannot be necessary to insert in this place extracts from the opinions of this Court wherein the grantee of a specific quantity of land to be located within defined exterior boundaries of a larger area is declared to possess the right of property to the entire tract within the exterior boundaries, and capable of enforcing that right in an action of ejectment until the proper authority, the Government of the United States, officially segregates the specific quantity by a finally approved survey. A mere citation of authorities will be sufficient. (*Vanderslice* v. *Hanks*, 3 Cal. 27, 47 ; *Gunn* v. *Bates*, 6 Id. 263, 272 ; *Ferris* v. *Coover*, 10 Id. 589 ; *Manson* v. *Koppikus*, 11 Id. 89 ; *Waterman* v. *Smith*, 13 Id. 373, 419 ; *Biddle Boggs* v. *Merced Mining Co.*, 14 Id. 279 ; *Morton* v. *Folger*, 15 Id. 276 ; *Cornwall* v. *Culver*, 16 Id. 423 ; *Teschemacher* v. *Thompson*, 18 Id. 27 ; *Riley* v. *Hirsch*, Id. 200, 201; and in the United States Supreme Court, *Fremont* v. *United States*, 18 How. 542.)

This right of property, this vested title, has not been alienated

by any of the modes prescribed at common law or by statutory regulations concerning conveyances, neither has it been divested by any proceeding in a Court of law.  And yet it is asserted that the right of property is extinct, or at least not in a condition to be enforced.  On what ground is this based ?  There can be but one, that of estoppel.  In no other way than on this venerable principle can a party be debarred from asserting his vested rights to property.

The doctrine of estoppel is defined in clear and concise language by Chief Justice Field in the recent case of *Biddle Boggs* v. *The Merced Mining Co.* (14 Cal. 367) in the following words :  " It is undoubtedly true that a party will, in many instances, be concluded by his declarations or conduct which have influenced the conduct of another to his injury.  The party is said in such case to be estopped from denying the truth of his admissions.  But to the application of this principle with respect to the title of property it must appear—1st, that the party making the admission by his declarations or conduct, was apprised of the true state of his own title ; 2d, that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud ; 3d, that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge; and 4th, that he relied directly upon such admission, and will be injured by allowing its truth to be disproved,  *  *  *  and these things must appear affirmatively."

In what manner do the facts of this case correspond with those necessary to constitute an estoppel under the foregoing definition. Is it attempted to be shown that the heirs made the asserted selection deliberately and with full knowledge that the consequences of such an act would inevitably be the contraction of their lines from the league and a half selected by their ancestor to the half league selected by themselves ?

Is it not apparent, rather, that they acted in this survey of 1853 in ignorance of their legal rights—in obscurity as to the perfection of their title to the entire external limits of the grant, by thus pursuing a course of procedure that would divest them of the right of possession to thousands of acres of land, and confine their property to the barren desert of sand included in that survey.

37

It would require the most pointed "affirmative" proof to establish such a state of facts as would indicate a full apprisal by the heirs of the exact character of their title, before their action could be converted into an estoppel. Such proof, or the offer of such proof, is lacking in the record.

Again, were these acts of the heirs performed with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; or were the appellants destitute of all knowledge of the true state of the title, and also of the means of acquiring such knowledge?

There can be no estoppel against the law. (*Fantitle* v. *Gilbert*, 1 Term, 171; *Jones* v. *Sasser*, 1 Dev. & Bat. 457.) The appellants are charged with the knowledge of the law. (*Moore* v. *Wilkinson*, 13 Cal. 489; *Ran* v. *Pope*, 2 Vern. 239; 1 Dev. & Bat. 452, 465; Adams' Eq. 374; 1 Sto. Eq. Jur. 391–393.) What was the law with the knowledge of which they are chargeable? 1st, that the Act of Congress of March 3d, 1853, sec. 6, recognized the land to the exterior boundaries of the grant in this case as private domain, until the official segregation by the Government of the specific tract; that it prohibited the grantee from making any selection for himself, by reserving to the Government the exclusive right to survey and segregate; that since no power of location or selection was bestowed upon the grantee, the entire tract within the exterior boundaries was private property, and a selection by the grantee was simply void, as against the Government, and necessarily equally void as to those claiming to hold from the Government.

The appellants, however, are chargeable with additional knowledge of the law, which is equally as conclusive as the knowledge that the land was private domain throughout its entire extent. They were apprised by the Act of Congress of March 3d, 1851, sec. 13 that lands held under Mexican grants can only be surveyed after confirmation; and by the Act of March 3d, 1853, sec. 3, that the Surveyor-General has no power whatever to survey any lands claimed under a Mexican grant, until after confirmation. They were further apprised by the well settled principles of law, that an officer acting beyond his powers, is possessed of no greater authority than a private individual; and, consequently, that the survey of

Mahoney *v.* Van Winkle.

1853 was of no greater effect than a private survey. They were further apprised, by an extensive train of decisions, that a private survey binds no one. (*Biddle Boggs* v. *Merced Mining Co.*, 14 Cal. 67–371; *Waterman* v. *Smith*, 13 Id. 416; *United States* v. *Hanson*, 16 Pet. 199; *United States* v. *King*, 3 How. 785; *Le Bois* v. *Brannell*, 4 Id. 457; *Mackay* v. *Dillon*, Id. 447; *Glenn* v. *United States*, 13 Id. 256; *Moore* v. *Wilkinson*, 13 Cal. 488; *Ferris* v. *Coover*, 10 Id. 631; *Rose* v. *Davis*, 11 Id. 133, 141; *Blake* v. *Dougherty*, 5 Wheat. 364); and, further, that occupation and cultivation can have no greater effect than a private survey. (*Waterman* v. *Smith*, 13 Cal. 416, and authorities cited. See also the Act of Congress relating to surveys in Louisiana, 2 Stat. at Large, 353, wherein initiatory surveys for presentation to the Land Commissioners are declared to be mere private surveys.)

As to the remaining element necessary to constitute an estoppel, viz.: that the appellants relied directly upon such admission, and will be injured by allowing its truth to be disproved, it will suffice to remark that the offer of proof is silent upon the subject; and it is left to inference to gather whether they did or did not rely directly on such admission.

*Tully R. Wise*, for Appellants, in reply.

I. One tenant in common cannot recover more than his undivided share in an action of ejectment.

*Denn* v. *Purvis et al.* (1 Burr, 326) was a case where a tenant in common declared for an undivided half. She was entitled to an undivided third. Lord Mansfield said: "This is an exceeding plain case. The rule is undoubtedly right, 'that the plaintiff must recover according to the title.' Here she has demanded half, and she appears entitled to a third, and so much she ought to recover."

In *Cretzer's Lessee* v. *Thomas* (1 Har. & J. 463) the declaration was for the whole land, and the deed showed title for an undivided moiety of the land in question. The verdict and judgment were for an undivided moiety.

Afterwards, the Maryland Courts held that, when there was a declaration for a tract of land, you might recover the whole or a

part of it, but could not recover an undivided part of the whole tract. (*Benson* v. *Musseter*, 7 Har. & Johns. 212.)

In *McFadden et al.* v. *Haley*, (2 Bay. 457) and in *Perry* v. *Middleton*, (Id. 539) the South Carolina Courts expressly say that a person can recover a part where the whole is sued for.

In *Roe* v. *Rowlston* (2 Taunt. 441) it is laid down as a rule that one parcener may be barred by the Statute of Limitations, while the other may recover his undivided part.

In *Doe* v. *Barksdale* (2 Brock. 439) Chief Justice Marshall cited and approved of the last case. He said (p. 445): " In reason, then, it would seem that each coparcener might recover his separate interest." And in this case the plaintiff recovered six-sevenths of the land.

In *Doe* v. *King* (5 Eng. L. & E. 517) it was distinctly and emphatically laid down that in ejectment plaintiff can recover only what he owns. This is a very important case.

In *Larue's Heirs* v. *Slack et al.* (4 Bibb, 358) there was a declaration for the whole. The proof showed the plaintiff entitled to an undivided part. The Court said: " In such a case, the plaintiff cannot recover the whole in severalty, but his recovery should be according to the extent of the title shown to be in the lessors."

In *Allen* v. *Trimble* (4 Bibb, 21) the Court held as they did in the case last above cited.

In *Craig* v. *McBride* (9 Dana, 427) the Court said that the plaintiff could only recover the share to which he showed himself entitled. (See ,also *Den* v. *Wannett*, 10 Ire. 446 ; *Godfrey* v. *Cartwright*, 4 Dev. 487 ; Arch. Forms, 380 ; *Leuver* v. *South*, 9 Ire. 237 ; *McArthur* v. *Porter*, 6 Pet. 205.)

We 'think the foregoing authorities establish these principles : 1. That in an action of ejectment the plaintiff can only recover upon the strength of his own title, and cannot found his claim or the weakness of his adversary's claim. 2. That the defendant may prevent the recovery of plaintiff by showing a title in himself, or by showing a clear subsisting title in a stranger. 3. Possession is presumptive evidence of right, and the defendant cannot be deprived of his possession by any person but the rightful owner of

the land—that is, he who hath the *jus possessionis.* 4. That a clear subsisting outstanding title in another, means such a title as the stranger could recover on in an action of ejectment. 5. That one tenant in common may be barred by the Statute of Limitations while the statute does not run against his co-tenant. 6. That where a person is owner of an undivided portion he can only recover such undivided portion, whether he sues his co-tenant or a stranger.

When this case was before the Court, we were pointed to the case of *Touchard* v. *Crow,* (20 Cal. 150) in which the question now before your Honors arose. That case is not discussed upon principle. It is decided upon the strength of *Stark* v. *Barrett* (15 Cal. 731). This last case is not discussed upon principle, and no authority is referred to. On the other hand, in the case of *Clark* v. *Huber,* (20 Cal. 196) the Court held that, in an action of ejectment, the plaintiff could only recover the half of the damages. This was admitted by the counsel who argued the case. Is there not an inconsistency in this ? Can a man be entitled to the whole of a thing, and only half damages for the withholding of that thing ?

In the case of *Welch* v. *Sullivan* (8 Cal. 187) this Court held, before the passage of our Statute of 1857, that tenants in common could not sue together—that is, they had no such joint interest as enabled them to bring suit together. Now, as the action of ejectment might be brought upon mere prior possession, or upon title, how is it that they could not sue together to recover their joint possession, if it is true that the possession of one is the possession of the other ? Joint tenants, having a unity of everything, must sue together. And if it were true that the possession of one tenant in common is the possession of the other, in the sense contended for, it would follow that they must sue together when they rely upon prior possession alone.

II.   The counsel for the respondent say we can have no standing in Court, because we cannot be preëmptioners, for the reason that the law of Congress prohibited us from taking any preëmption claim on land claimed by a Spanish grant. By the Act of 1841, only surveyed public lands could be preëmpted. California being an exceedingly large State, and her population being scattered all

over the State, Congress, for the benefit of settlers, deemed it expedient to extend the preëmption privilege by the Act of 1853 (U. S. Statutes at Large, vol. 10, sec. 6, p. 246) to unsurveyed lands. As long as preëmption rights could only be acquired on surveyed lands the Government could protect Spanish grants by refusing to survey the adjoining lands until such grant was confirmed and surveyed. And this was absolutely necessary, for the reason that many of the Spanish claims were at best mere equities, and would have been divested by subsequent legal titles, acquired before the equity was perfected into a legal title. But when the Government determined to extend the preëmption laws to unsurveyed public lands as well as surveyed, it was necessary to protect those equities acquired under the Mexican Government, hence the proviso. It only meant to protect Spanish grants by giving them the preference ; but, saving their rights, the preëmption is perfectly good. If this were not so, then these lands never can be preëmpted, until Congress chooses to pass a law making them so, even after the survey.

This construction certainly would change the whole meaning of the Acts of 1841 and 1853 ; for the Act of 1841 extended to all public lands which were surveyed, and the Act of 1853 was meant to extend the law of 1841 to unsurveyed as well as surveyed public lands. The Act of 1853 was not intended to alter the Act of 1841 in any particular. This law of 1853 did not mean any claim that any person thought proper to make to any land in the State, for otherwise any person could have defeated all preëmption claims by claiming the whole State, and such lands as were claimed by grants which were never presented would not be liable to preëmption. Congress never meant this. They meant to say that in respect to such lands as were finally confirmed and surveyed, the preëmption right should not affect the Spanish grant.

III. A Mexican grant without juridical possession is not such a title as will sustain ejectment.

It is useless in this case to argue this *in extenso.* It is sufficient to make a few general observations. First, every grant provided that the grantee should get from the municipal authority juridical possession. When he got juridical possession he had such a title

as he could recover upon; but until then he only had an equity, which could lead to the possession, but this was by an official act. This is directly said by the Supreme Court of the United States in Fremont's case (17 How). Here they recognized the fact that preëmptors might get a better right than Fremont by locating their claims first. Until location he has a right to a specific quantity; after location he has a right to the specific land itself.

Could Fremont recover in an action of ejectment seventy or eighty leagues of land when he was only entitled to eleven? Can Mahoney recover a league and a half of land when he is only entitled to a half league?

IV. The Surveyor-General is an officer appointed by the Government, whose acts are just as conclusive as are the decisions of the District Court, unless they are reversed. Under the Act of 1860 he made a survey of Mahoney's land. That is a decision, and is the law of the case until it is reversed. The United States District Court alone can reverse it. And if the District Court confirms it, the Supreme Court of the United States can revise that decision.

FIELD, C. J. delivered the opinion of the Court—COPE, J. and NORTON, J. concurring.

This is an action of ejectment to recover the possession of a tract of land known by the name of the "Rancho Laguna de la Merced," situated partly in the county of San Francisco and partly in the county of San Mateo. The plaintiff deraigns his title from the former Mexican Government through a grant issued by the Governor of California to one Galindo in September, 1835. Some of the defendants rested their defense upon the inability of the plaintiff to establish a right to the possession, simply denying in their answers the allegations of the complaint; but the majority of them also set up title in themselves to specific parcels of the premises as preëmptioners under the laws of the United States, and each of them demanded a separate verdict. The Court instructed the jury to find generally in favor of two of the defendants, and to render a separate verdict against each of the other defendants, with a qualification, however, which in effect rendered the instruction one to

find generally against each of the latter defendants. The verdict rendered was substantially in conformity with the instruction. To its form objection was taken at the time, but it does not appear from the record in what particular it was urged that its form was defective. The objection as stated was too general to merit consideration.

The grant to Galindo cedes the tract known by the name of "Laguna de la Merced," and contains the usual conditions annexed to grants in colonization. It authorizes the inclosure of the land, with a reservation of the crossings, roads, and servitudes, and confers upon the grantee the free and exclusive enjoyment of the same, with a right to subject it to such use and cultivation as may suit his convenience; and requires the erection of a house thereon and its inhabitation within one year. Immediately after its receipt the grantee entered upon the premises, and within the period designated erected a house thereon and occupied it for nearly two years, when he sold and conveyed his interest to Francisco de Haro. The latter immediately went into possession, and resided with his family upon the premises until his death in 1848 or 1849. In 1852 the claim for the land embraced by the grant was presented by his heirs to the Board of Land Commissioners for confirmation, and by the decree of that body, and afterwards on appeal by the United States District Court, was confirmed. The decree of the latter tribunal became final by the refusal of the Government to prosecute an appeal therefrom, and by the stipulation of the District-Attorney. The validity of the grant is, therefore, a settled question for all time. (*Mott* v. *Smith*, 16 Cal. 551.)

As we have already observed, the grant is for a specific tract of land. In this respect it is distinguished from a large class of grants of mere quantity within vague and undefined boundaries, like the grant of Alvarado, under which Fremont claimed. In these latter cases it was undoubtedly the intention of the Government simply to indicate the general locality from which the quantity granted might be selected, and not to pass the entire property within the exterior limits designated. Here the case is different. Here a specific tract, known by a particular name, is ceded, and reference is made to a map accompanying the petition of the grantee for its

boundaries. The petition represents the tract to be a league in length, and a half of a league in width, more or less. A map similar to the one referred to was required by the Mexican Regulations of November, 1828, which were adopted to carry into effect the Colonization Law of August, 1824, in all cases where a grant of lands was solicited. And the grant usually followed the map or the petition in the general description of the land, and where a certain quantity was stated in the petition to be embraced within a particular tract named or within certain specified boundaries, it was customary, in order to prevent mistakes or imposition, to insert a clause reserving for the benefit of the nation any surplus which might be found upon a survey and measurement by the officers of the Government. (*Ferris* v. *Coover*, 10 Cal. 621.) Until by such a proceeding it was officially determined that within such particular tract or designated boundaries there was a surplus, and it was set apart, the right to the possession of the entire tract rested with the grantee. Until then, as we said in *Cornwall* v. *Culver*, (16 Cal. 429) " no individual can complain, much less can he be permitted to determine, in advance, that any particular locality will fall within the supposed surplus, and thereby justify its forcible seizure and detention by himself. If one person could in this way appropriate a particular parcel to himself, all persons could do so; and thus the grantee, who is is the donee of the Government, would be stripped of its bounty, for the benefit of those who were not in its contemplation and were never intended to be the recipients of its favors."

To this doctrine of the right of the grantee until the official measurement, the common objection is urged that under it double or treble the quantity intended to be ceded by the Government may be possessed by him. Under a grant, it is said, of a tract supposed to embrace but one league, the grantee may, in accordance with this doctrine, recover two or more leagues, and parties equally entitled to the consideration of the Government be thus excluded from settlement upon land which will ultimately be determined to be part of the public domain. The objection thus urged is more specious than sound. If there be a surplus within the designated boundaries of the tract over the specific quantity alleged

by the grantee in his petition, or intended to be ceded by the grant, the Government can at any time, by directing its measurement and segregation, restrict the grantee's possession. The grantee cannot himself make the measurement and segregation so as to bind the Government. He cannot know what particular part of the general tract the Government may assign to him, or what part it may reserve to its own use, or offer for sale, or settlement. He is, therefore, directly interested until the official segregation to protect the entire tract from waste and injury, and to improve it; and until then, third persons cannot question his right to the possession of the whole. They have no authority to fix the limits of his possession, under any pretense of a desire or intention to make a settlement upon the surplus which the tract may contain over the specific quantity designated. Lands thus situated are not open to settlement by the legislation of Congress, but on the contrary are expressly exempted therefrom. The determination, therefore, of the limits of the grantee's possession is a matter resting solely between himself and the Government. Were the rule otherwise, the grantee would find his possession limited, first in one direction and then in another, each intruder coveting a particular tract, asserting that it fell within the surplus reserved to the uses of the nation, until at last the grantee would be excluded from the entire tract. If the doctrine we have stated be not correct, when applied to a grant embracing within its boundaries a large surplus, it is not correct when there is any surplus, even if it be only of a few acres instead of leagues. The surplus acres would be asserted to lie in every portion of the general tract, according to the views or designs of the particular trespasser.

There is indeed no middle ground between the doctrine we have stated and the doctrine which denies to the grantee all right of possession to any portion of the granted premises until the official segregation; and it will not be pretended that under the Mexican law, or, to speak more accurately, under the construction given to that law by the Mexican authorities in California, possession was withheld until such segregation was had. Under that law the segregation was effected by the ceremony known as the delivery of juridical possession. But this proceeding could not be legally taken

at all until the concession had been approved by the Departmental Assembly, and such approval was often delayed for years. In numerous cases it had not been obtained when by the conquest the jurisdiction of the Assembly was displaced. Yet the grantee genenerally took possession at once upon the issuance of the grant, and his possession was respected, both by the authorities of the Government and the adjoining proprietors. It is true, the Mexican Regulations of 1828 contemplated that the approval of the Departmental Assembly should be obtained to the concession of the Governor before the definitive grant issued. So, where the grantee regularly received his title papers the concession was final. The law then intended an immediate delivery of the possession by the proper magistrate of the vicinage. This proceeding had a double operation; first, to make a formal tradition or livery of seizin of the property, which was essential under the civil as at the common law; and second, to measure off and segregate the specific quantity granted, and establish its boundaries. But in time the practice grew up of issuing the final title papers without waiting for the approval of the Departmental Assembly, and as juridical possession could not regularly be made previous to such approval, a provisional possession of the entire tract designated was permitted. Conditions were annexed to grants thus issued, substantially similar to those annexed to grants issued subsequent to the approval. They conferred upon the grantee the same right to the exclusive use and enjoyment of the land, and oftentimes exacted the construction of a house thereon, and its inhabitation, within a year afterwards. Independent of express conditions on this point, the grants were held subject to the same conditions of cultivation and occupancy, under the Regulations of 1828, as grants already confirmed, and a compliance with these conditions was required to avoid a denouncement and a possible forfeiture of the land. And such compliance, as we observed in *Cornwall* v. *Culver* (16 Cal. 426) is considered by the tribunals of the United States as a most material circumstance in determining the right of the grantees to a recognition and confirmation of their claims.

The counsel of the defendants, though controverting this view of the right of the grantee until the official measurement, rested their

defense chiefly upon an alleged selection and location of the specific quantity designated in the grant by parties claiming under him, and their disclaimers of title to the remainder. The proof they offered on this point was excluded, upon the objection of the plaintiff, and the ruling in this respect constitutes the principal error upon which they rely for a reversal of the judgment.

There is no doubt that a selection and location of the specific quantity may be made by the grantee (and of course by parties claiming through him) under such circumstances and accompanied with such disclaimers as to estop him from the assertion of any title or right to the possession of the remainder existing within the exterior boundaries of the general tract, until by the action of the Government it is determined that his claim under the grant shall be satisfied by land elsewhere selected. There is nothing in the nature of a colonization grant prohibiting him from restricting, if so disposed, his general right to the possession of the entire tract. And we accept as substantially correct the position of counsel that " when the grantee selects his location and quantity, uses it, leases it, sells or mortgages it, and disclaims title to the remainder, it (the selection) is, and ought to be, obligatory on him until the Government overrules his election and assigns him the land elsewhere." And we agree with counsel in their statement that: " by this rule, no hardship is imposed on the grantee. He selects the quantity he is entitled to, and is protected in the enjoyment of it pending his proceedings to perfect the title ; and if the Government repudiates his selection and assigns him other lands, his title attaches to the new location. In this way exact justice is done to all. The grantee gets all the grant entitles him to, and settlers outside his location are not disturbed, unless the Government, in the exercise of its sovereign right to segregate the lands of the grantee from the public domain, shall include their possessions in the tract finally awarded to the grantee ; in which event their rights must of course yield to his." The question, then, for determination is whether the proof offered tended to establish any binding selection and location under the grant to Galindo. It is not pretended that any such selection and location were made previous to the year 1853. Up to that time, from the issuance of the grant in 1835—a period of nearly

eighteen years—the grantee, or the De Haros claiming under him, were in the peaceable and exclusive possession and enjoyment of the entire tract. The grantee, soon after the concession, built a house upon it near its southern line, and occupied the house for one or two years. De Haro built another house near the same spot, and a third house near the northern line of the tract. Both parties resided upon the premises with their families, Galindo until his sale, and De Haro until his death in 1848 or 1849. The heirs of De Haro resided upon them after their father's death. During this long period no one, so far as appears from the record, questioned their right to the possession of the entire tract or disturbed them in its use. It is upon an alleged selection and location by a survey made in September, 1853, and alleged subsequent disclaimers of title to the lands outside of that survey, that the defendants rely. They offered to prove, substantially, that previous to June, 1853, the lands occupied by them had been "townshiped and section-ized" like other public lands of the United States; that in Sep-tember, 1853, the grantors of the plaintiff caused a survey to be made of the specific quantity designated in the grant; that the claimants under the grant assented to such survey when made; that afterwards *some* of the grantors sold, mortgaged, and leased portions of the lands lying within the survey, and to the defendants and others publicly disclaimed having any title to or interest in the residue of the general tract; that acting under such disclaimers and acts of *some* of the said grantors they made their locations; and that they were not within the lines of the said survey. The proof thus offered was, in our judgment, properly excluded.

The defendants could not demand any protection solely as pre-emptioners, for, until the official segregation of the specific quantity designated in the grant, the entire tract was expressly exempted from preëmption and settlement by the Act of Congress. Their right to freedom from disturbance in their occupation rested, there-fore, upon the alleged assent of the claimants to a restriction of their rights to the tract surveyed, and their alleged disclaimers as to the balance. But nearly all these claimants—who were seven in num-ber—were incapable of giving any binding assent to such restric-tion, or making any binding disclaimers. Three of them at the

time were infants, and two of them were under the disability of coverture.    Besides, only a portion of the claimants were grantors of the plaintiff, and it was not in the power of *some* of them to affect by their action or disclaimers the rights of the other grantors or other claimants.    No action of a portion of several tenants in, common can impair the rights of their co-tenants.

There is nothing in the language of the Court in *Riley* v. *Hirsch* (18 Cal. 198) which conflicts with the views we have here expressed. That case was an action of ejectment for the possession of certain real estate situated within the City and County of Sacramento, covered by the grant issued by Governor Alvarado to John A. Sutter in June, 1841.    The grant embraced a quantity exceeding the eleven leagues ceded, though from the reservation of " the lands inundated by the impulse and currents of the rivers," it was difficult, if not impossible, without a survey, to state with anything like accuracy the extent of the excess.    But it appeared from the evidence that Sutter had been in possession of the land embraced within the county of Sacramento for years, both before and after the cession of the country to the United States, asserting ownership of it under his grant, and subjecting it to all such uses as he desired without disturbance from any one ; and we held that the grant itself conferred a right to the possession—giving to it the same effect which was attributed to it by the Mexican authorities in California ; and that though the specific quantity granted could only be definitively and permanently located by a survey and measurement by the proper officers of the Government, yet that it was competent for the grantee, to enable him to comply with the conditions annexed, to make a temporary selection and location, which would be binding and effectual as against intruders and trespassers, and all parties, until the action of the Government.    We do not desire to qualify what we thus held.    No party but the Government can question any selection made by the grantee under his grant. As against all other parties it is sufficient for the grantee to show that the land selected lies within the boundaries designated in the grant.    But to restrict the possessory right of the grantee to the selection made, the selection must be accompanied with such disclaimers as to the residue of the general tract as to operate as an

estoppel upon him.    There is nothing in the present case creating such an estoppel upon the plaintiff or the parties through whom he claims.

We do not attach any importance to the fact that after the final confirmation of the grant a survey was made by the United States Surveyor-General, and returned to the District Court under the Act of 1860, such survey having been excepted to by the Government, and not having been approved by the Court.    By that act, when a survey has been made and plotted, it is the duty of the Surveyor-General to publish notice of the fact for four weeks.    In the meantime the survey and plot are to be retained in his office subject to inspection.    If, upon the expiration of the publication, no application has been made for a return of the survey into the District Court for examination and adjudication, or if made, the application has been refused, the survey becomes final.    On the other hand, if the survey be ordered into Court, it does not become final until it has been approved or has been modified and reformed by the decree of the Court.    Until the survey is established in one of these ways, it is without any binding force.    Until then it is only a preliminary proceeding, amounting in effect to no more than a mere report of the action of the Surveyor, filed in his office for the inspection of all parties interested, or returned by him into Court by its order, for examination and adjudication.    Nor does it make any difference that the exceptions to the survey were taken by the Government, and not by the claimants.    Until established in one of the ways we have mentioned, the survey is not binding upon either party.    When it binds one party it binds both.

The right of one tenant in common to recover in the action of ejectment the possession of the entire tract as against all persons but his co-tenants, has been repeatedly held by this Court. (*Touchard* v. *Crow*, 20 Cal. 162 ; *Stark* v. *Barrett*, 15 Id. 371.) The action is merely for the possession ; it determines no rights but those of present possession ; and that one tenant in common has such rights as against all parties but his co-tenants is not doubted. The doctrine of the Court, therefore, only allows the enforcement by action of an acknowledged right.

Judgment affirmed.

NORTON J.—The usual form of Mexican grants in California is for a certain tract of land called by a particular name, having boundaries which are designated and also shown on a map, and stating that the land granted contains a specified quantity, a little more or less; that juridical measurement must be made, and that the surplus will remain to the nation.

The Supreme Court of the United States have decided that such grants convey only the quantity named, and not the whole of the tract described, in case such tract exceeds in extent the quantity named.

Under these circumstances, a question arises whether, before a juridical survey, such a grant conveys a title to the whole of the land within the designated boundaries upon which an action of ejectment can be maintained, or whether it merely conveys a right to have a particular portion laid off within those boundaries, and which right until such survey is but an equity, and not a legal title sufficient to sustain an action of ejectment for any particular portion.

That such a grant conveys a title upon which an action of ejectment may be maintained, for at least the quantity specified, has been several times decided by this Court, and I think must be considered as settled, so far as the question depends upon the judgments of the State Courts.

This point being established controls the case. If, before a juridical survey, the grantee can recover any particular portion, he can recover the whole.

The point urged by the defendants, that the plaintiff, or those under whom he claims, have limited their right of recovery to a particular portion by a temporary selection, cannot be sustained on the facts in this case, for the reasons given in the opinion of the Court, if such a consequence could ever result from the acts of the grantee before a final survey.

The judgment should therefore be affirmed.