## GEORGE W. FRASHER & Others *v.* O'CONNOR.

IN ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

Argued April 10, 1885.—Decided May 4, 1885.

In adjusting Congressional grants of lands to a State, the only questions for consideration by the officers of the United States are, whether the State possessed the right to claim the land under the grant, and whether the land was subject to selection by its agents. Those officers have no jurisdiction to review transactions between the State and its purchasers, nor between the State and its locating agents, and determine whether such purchasers or locating agents complied with the provisions of its laws relating to the sale of the lands.

Surveys under the eighth section of the act of July 23, 1866, "to quiet land titles in California," become operative by approval of the United States Surveyor General for the State, and his filing in the local land office of the township plats. Upon such approval of a survey and filing of the township plats, lands thereby excluded from a confirmed private land claim become subject to State selections and other modes of disposal of public lands. Previous approval of the survey by the Commissioner of the General Land Office is not necessary.

Lists of Lands certified to the State by the Commissioner of the General Land Office, and the Secretary of the Interior, convey as complete a title as patents ; and lands embraced therein are not thereafter open to settlement and pre-emption.

This was an action in the nature of ejectment to recover possession of a tract of land in California. The facts which make the case are stated in the opinion of the court.

*Mr. George F. Edmunds (Mr. William J. Johnston* was with him) for plaintiffs in error.

*Mr Edward R. Taylor* for defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court.

This is an action for the possession of a parcel of land in Los Angeles County, California. The plaintiff, the defendant in error here, traces title to the premises by a patent of the State, issued to Robert Thompson on the 21st day of April, 1874, and certain mesne conveyances from the patentee. The title of the State was derived from selections of land in lieu of sections sixteen and thirty-six granted for school purposes by the act of Congress of March 3, 1853.

The defendants below, the plaintiffs in error here, contend that the selections by the State were void, because made within the asserted limits of a claim under a Mexican grant before the survey of such grant, which excluded the disputed premises, had become final; and set up a right to the land as pre-emptors under the laws of the United States by settlement and improvement subsequent to the State patents, with a tender to the officers of the Land Department of the required sums in such cases to entitle them to patents of the United States.

The position of the defendants below is, that, being entitled as such pre-emptors to patents from the United States of the lands in controversy, they are in a position to call in question the validity of the proceedings by which the land was selected by the State agents and listed to the State. To determine the questions thus presented, it will be necessary to give a brief history of the legislation of Congress, and of California with respects to the lands granted to the State for school purposes.

The act of Congress of March 3, 1853, "to provide for the survey of the public lands in California, the granting of pre-

emption rights therein, and for other purposes," 10 Stat. 246, § 6, placed the public lands in that State, with certain specified exceptions, subject to the general pre-emption law of September 4, 1841. Among the excepted lands were sections sixteen and thirty-six of each township, which were declared to be thereby granted to the State for the purposes of public schools, and lands claimed under any foreign grant or title. The act also declared, in its seventh section, that where a settlement by the erection of a dwelling-house, or the cultivation of any portion of the land, should be made on the sixteenth and thirty-sixth sections before they should be surveyed, or where such sections should be reserved for public uses, or "taken by private claims," other lands should be selected in lieu thereof by the proper authorities of the State.

The lands in controversy were within the boundaries of a tract claimed under a confirmed Mexican grant, known as the Rancho Sausal Redondo. As sections sixteen and thirty-six of townships were covered by the grant, a case was presented within the seventh section of the act of Congress, in which the State was authorized to select other lands in lieu of them.

The Legislature of California, by an act passed April 27, 1863, provided for the sale of certain lands granted to the State by Congress, and, among others, of the sixteenth and thirty-sixth sections in the several townships, or of lands which might be selected in lieu thereof. It prescribed the proceedings to be taken for the purchase of the lands, and required each State locating agent to keep a record of applications to purchase made to him, and when they amounted to three hundred and twenty or more acres, to apply on behalf of the State to the register of the United States land office of the district for such lands, in part satisfaction of the grant under which they were claimed, and to obtain his acceptance of the selections thus made. Various other proceedings were required by the act to secure a proper presentation to the Land Department of the United States of the lands thus purchased of the State; that is, of lands thus selected in satisfaction of the grant to her.

Surveys of the public lands in California were greatly delayed after the passage of the act of 1853, and as late as 1866 many

townships had not been surveyed. For want of these surveys, it was impossible to ascertain the precise locality, in each township, of the sixteenth and thirty-sixth sections, and of course, except in a few instances such as where the whole township was embraced in a private claim under a Mexican or Spanish grant, it could not be known whether there had been any such settlement on those sections as would authorize the State to select other lands in lieu thereof.

The State was embarrassed by this delay in the public surveys, not only in the use of the sixteenth and thirty-sixth sections, and, when they were occupied by settlers, in the selections of lands in lieu of them, but also in the selection of lands granted by other acts of Congress than that of March 3, 1853. By the eighth section of the general pre-emption law of September 4, 1841, five hundred thousand acres of land were granted to each new State subsequently admitted into the Union, and of course to California, for purposes of internal improvement, the selection of the lands to be made from any public land within her limits, except such as was or might be reserved from sale by a law of Congress or the proclamation of the President, and in such manner as her Legislature should direct, and located in parcels conformably to sectional divisions and subdivisions of not less than three hundred and twenty acres in any one location.

In May, 1852, in advance of any surveys by the United States, the State passed an act for the sale of these five hundred thousand acres. It authorized the governor to issue land warrants for not less than one hundred and sixty acres, and not more than three hundred and twenty acres in one warrant, to the full amount of the grant, the treasurer to sell them at two dollars an acre, and the purchasers and their assigns to locate them on behalf of the State on any vacant and unappropriated land belonging to the United States subject to such location.

Under these laws selections were made by agents of the State, or purchasers of warrants who were authorized to locate the same. Similar legislation was had and similar proceedings were authorized with respect to other lands granted by acts of Congress to the State. When, however, selections thus made

were brought to the attention of the Land Department at Washington, they were not recognized as conferring any right to the parties claiming under them. Selections made in advance of the public surveys were held to be wholly invalid. This ruling of the department caused great confusion and embarrassment in the State. Titles thought to be unquestionable were found to be worthless, and interests of great magnitude which had grown up upon their supposed validity were endangered. To relieve against the embarrassments arising from this cause the act of Congress of July 23, 1866, "to quiet land titles in California," 14 Stat. 218, was passed. The first section of this act declares, that, in all cases where the State of California had previously made selections of any portion of the public domain in part satisfaction of a grant made to the State by act of Congress, and had disposed of the same to purchasers in good faith under her laws, the lands so selected should be and were thereby confirmed to the State.

From this confirmation were excepted selections of lands to which an adverse pre-emption or homestead or other right had at the date of the passage of the act been acquired by a settler under the laws of the United States, and of lands reserved for naval, military or Indian purposes, and of mineral land or of land claimed under a valid Mexican or Spanish grant.

The second section provided that where the selections had been made of land which had been surveyed by authority of the United States, it should be the duty of the authorities of the State, where it had not already been done, to notify the register of the United States land office for the district, in which the land was located, of such selections; and that the notice should be regarded as the date of the State's selections.

The third section provided that where the selections had been made of land which had not been surveyed by authority of the United States, but the selections had been surveyed by authority of and under laws of the State, and the land sold to purchasers in good faith, such selections should, from the date of the passage of the act, when marked off and designated in the field, have the same force and effect as the pre-emption rights of a settler on unsurveyed public land.

As thus seen, selections made pursuant to this act, embracing lands held or claimed under a valid Mexican or Spanish grant, were excepted from confirmation. By the act of 1853, 10 Stat. ch. 145, § 6, lands claimed under "any foreign grant or title" were excepted from pre-emption. The effect of these exceptions was to exclude from settlement large tracts of land in the State, which, upon a definite ascertainment of the boundaries of the grants, would have been open to settlement. A very great portion of the lands in the State were covered by Mexican or Spanish grants. Some of the grants were by specific boundaries, and the extent of the land covered by them could be readily ascertained without an official survey. But, by far the greater number were of a specific quantity of land lying within outboundaries embracing a much larger quantity. Thus, grants of one or two leagues would often describe the quantity as being within boundaries embracing double or treble that amount, the grant declaring that the quantity was to be surveyed off by officers of the vicinage, and the surplus reserved for the use of the nation. The grantee in such case was of course entitled only to the specific quantity named, but what portion of the general tract should be set apart to him could only be determined by a survey under the authority of the government. Until then the grantee and the government were tenants in common of the whole tract. No one could intrude upon any portion of it, the whole being exempted from the pre-emption laws. The practical effect of this condition in many cases was to leave the grantee, until the official survey, in the possession, use and enjoyment of a tract of land containing a much larger quantity than that granted. And before such survey could be made the validity of the grant was to be determined by the commission appointed to investigate private land claims in California, and the action of the commission was subject to review by the District Court of the United States, with a right of appeal from its decision to the Supreme Court. When the validity of the grant was confirmed the confirmee could not measure off the quantity for himself and thus legally segregate it from the balance of the tract. As we said in *Van Reynegan* v. *Bolton,* 95 U. S. 33, 36 : " The right to make

the segregation rested exclusively with the government and could only be exercised by its officers. Until they acted and effected the segregation, the confirmees were interested in preserving the entire tract from waste and injury, and in improving it; for until then they could not know what part might be assigned to them. Until then no third person could interfere with their right to the possession of the whole. No third person could be permitted to determine, in advance of such segregation, that any particular locality would fall within the surplus, and thereby justify his intrusion upon it and its detention from them. If one person could, in this way, appropriate a particular parcel to himself, all persons could do so; and thus the confirmees would soon be stripped of the land which was intended by the government as a donation to its grantees, whose interests they have acquired, for the benefit of parties who were never in its contemplation. If the law were otherwise than as stated, the confirmees would find their possessions limited, first in one direction and then in another, each intruder asserting that the parcel occupied by him fell within the surplus, until, in the end, they would be excluded from the entire tract. *Cornwall* v. *Culver*, 16 Cal. 423, 429; *Riley* v. *Heisch*, 18 Cal. 198; *Mahoney* v. *Van Winkle*, 21 Cal. 552."

The delays before the official surveys were made, even after the confirmation of a grant, sometimes lasted for years. In some instances they were attributable to the want of sufficient appropriations by Congress to meet the expenses of the surveys. To obviate them from this cause Congress provided in § 6 of the act of July 1, 1864, "to expedite the settlement of titles to lands in the State of California," 13 Stat. ch. 194, that it should be the duty of the Surveyor General of California to cause all private land claims finally confirmed to be accurately surveyed and plats thereof to be made whenever requested by the claimants: provided, that each claimant requesting a survey and plat should first deposit in the District Court of the district within which the land was situated a sufficient sum of money to pay the expenses of such survey and plat, and of the publication required by the first section of the

act. And in § 7 it prescribed the manner in which the surveys should be made.

But, inasmuch as a confirmee had the possession and use of the whole tract, from which his quantity was to be taken, until it was segregated, he was not in haste to have the survey made of his claim. It was for his interest to postpone it; and therefore few confirmees of grants of quantity within exterior boundaries, embracing a larger amount, applied for surveys under that act. Accordingly when the act of July 23, 1866, " to quiet land titles in California " 14 Stat. 218, ch. 219, was passed, confirming selections previously made by the State, except those from lands held or claimed under a valid Mexican or Spanish grant, it provided in § 8 as follows: " That in all cases where a claim to land by virtue of a right or title derived from the Spanish or Mexican authorities has been finally confirmed, and a survey and plat thereof shall not have been requested within ten months from the passage of this act, as provided by sections six and seven of the act of July first, eighteen hundred and sixty-four, 'to expedite the settlement of titles to lands in the State of California,' and in all cases where a like claim shall hereafter be finally confirmed, and a survey and plat thereof shall not be requested, as provided by said sections within ten months after the passage of this act, or any final confirmation hereafter made, it shall be the duty of the Surveyor General of the United States for California, as soon as practicable after the expiration of ten months from the passage of this act, or such final confirmation hereafter made, to cause the lines of the public surveys to be extended over such land, and he shall set off, in full satisfaction of such grant, and according to the lines of the public surveys, the quantity of land confirmed in such final decree, and as nearly as can be done in accordance with such decree; and all the land not included in such grant as so set off shall be subject to the general land laws of the United States: *Provided*, that nothing in this act shall be construed so as in any manner to interfere with the right of *bona fide* pre-emption claimants." 14 Stat. 220, 221.

After the passage of this act neither the State, nor persons

desiring to settle upon the public lands, were obliged to wait beyond ten months for the grantee of a confirmed Mexican land claim to take action for the segregation of the specific quantity granted to him. If he delayed for that time after the passage of the act, if his claim had been previously confirmed, or for that time after the confirmation of his claim, if it should be subsequently confirmed, to obtain a final survey, it became the duty of the Surveyor General of the United States to proceed and extend the lines of the public surveys over the land and to set off in satisfaction of the grant, and according to the lines of such surveys, the quantity of land confirmed, and all the land not included in such grant as so set off was made "subject to the general land laws of the United States."

The grant known as the Rancho Sausal Redondo was made to Antonio Ygnacio Abila, May 20, 1837, by Alvarado, then governor *ad interim* of the department of California. The claim of the grantee to the land was confirmed on the 10th of June, 1855, by the Board of Land Commissioners for the ascertainment and settlement of private land claims in California, and at its December term, 1855, by the District Court of the United States. It embraced land within the limits of Los Angeles County. The decree of the District Court became final, the appeal from it to the Supreme Court having been dismissed by stipulation of the Attorney General. In 1858 a deputy surveyor made a survey of the claim, but it was not approved by the Surveyor General, and was, in consequence, of no validity. For more than ten years afterwards no other survey was made, nor does it appear from the record that the grantee, or those owning the claim, made application for any under the act of July 1, 1864. Accordingly, in 1868, more than ten months having elapsed after the passage of the act of July 23, 1866, at the instance of General Rosecrans, the rancho was surveyed by a deputy United States surveyor, George Hansen, and land was set off to the grantee in satisfaction of the grant. Over the land within the boundaries of the grant confirmed the United States surveyor extended the section and township lines; and, on April 22, 1868, the town-

ship plats were filed in the district land office of San Francisco. Subsequently General Rosecrans, as hereafter stated, applied to the State to purchase the lands outside of the tract allotted to the grantee, part of which are the subject of the present controversy. The owners of the grant protested that notice of the survey had not been given to them, and that it did not conform to the decree of confirmation, and demanded a new survey. The Surveyor General thereupon recalled the township plats and ordered a new survey, which was made in July, 1868, by deputy surveyor Thompson. This new survey included the lands in controversy as part of the grant. Afterwards, however, in October, 1871, the Secretary of the Interior set aside this new survey, ordered the township plats to be returned to the land office, and affirmed the survey made by Hansen. Before, however, the recall of the township plats, and the order for a new survey, General Rosecrans had procured a number of men to make applications for his benefit for the purchase of the lands in controversy, and to transfer their interests thus acquired to him. The applications were approved by the locating agents of the State, and the lands as selections by the State were afterwards listed to her, and patents were issued to the purchasers or their assignees. According to the findings of the local District Court, the applications and subsequent proceedings were very loosely conducted, and great irregularities are charged against the principal purchaser. But if the locating agents of the State were satisfied with the applications to purchase, and the selections thus made were approved by the Land Department of the United States, and the lands were listed to the State as part of the grant to her, it is not perceived what ground of complaint the loose character of the proceedings furnish to the defendants. Their title is not advanced by showing how irregularly the proceedings were conducted by parties who obtained the title of the State; and to the general government it is enough that she does not complain, but accepts the selections in satisfaction of the grant to her. The same view was taken by the Interior Department with reference to one of the State selections referred to. It was objected that the selection was invalid because not made in accordance with

the provisions of the act of the legislature of the State, of April 27, 1863. But the Secretary answered that it was not necessary to enter into a consideration of the alleged defects in the application of the purchaser; that was a question between him and the State; that by the seventh section of the act of March 3, 1853, the State was granted indemnity if sections sixteen and thirty-six lay within private grants; that the manner of selecting such indemnity was not specified; that the act of the legislature had provided for the sale of certain lands belonging to the State, and if purchasers failed to comply with the requirements of the statute, their claims may fail; that the questions to be considered by the general government were, the right of the State to claim the land under her grant, and was the land subject to selection, observing that these were the only questions to determine, as the general government only recognized the State in the proceedings; that "it was no part of its duty to inquire into the transactions between the State and her purchasers, neither would it go back of the record to ascertain whether as between the State and her agent he complied with the provisions of the statute relating to the sale of granted land." The Secretary added that there was no complaint on the part of the State of any irregularity in the selection in question, but, on the contrary, she had recognized and approved of it and issued a patent to the purchaser. And, further, that the legislature of the State had passed an act for the relief of purchasers of State lands, approved March 27, 1872, declaring that when application had been made to purchase such lands, and full payment had been made to the treasurer of the proper county for the same, and a certificate of purchase or patent had been issued to the applicant, the title of the State was vested in him or his assignees, if no other application had been made for the purchase of the land prior to the issue of the certificate. Thus, said the Secretary, has the State in the most emphatic manner asserted her claim to the land notwithstanding the alleged irregularities on the part of her agent in selecting the same.

To this action of the State it may be added, that the general government has, by the act of Congress of March 1, 1877,

relinquished every possible objection on its part to a recognition of the claim of the State, by confirming her title to lands certified to her as indemnity school selections in lieu of the sixteenth and thirty-sixth sections lying within Mexican grants, the final survey of which had not been made; and also confirming indemnity school selections certified to the State, which were defective or invalid from any other cause.

The sole question, therefore, remaining for our determination is, whether the premises in controversy were open to selection at the time the selection was made. And of this we think there can be no reasonable doubt. The Mexican grant, under which the land was claimed, had been confirmed in December, 1856, and although, as stated above, a survey had been made by a deputy surveyor in 1858, it had not been approved by the Surveyor General, and was, therefore, of no effect. No other attempt was made to obtain a survey of the land until February, 1868, over eleven years after the confirmation of the grant, and over three years after the passage of the act of July 1, 1864, and over eighteen months after the passage of the act of July 23, 1866. Had a survey been called for by the grantee, or made under the act of 1864, it would have required the approval of the Commissioner of the General Land Office before it could have been the basis of action by the State or by individuals. But the grantee having neglected to take any action, and ten months having elapsed after the passage of the act of 1866,-it was competent for the Surveyor General of California, and indeed it was made his duty, to extend the lines of the public surveys over the land confirmed; and the act declares that " he shall set off, in full satisfaction of such grant, and according to the lines of the public surveys, the quantity of land confirmed in such final decree, and, as nearly as can be done, in accordance with such decree, *and all the land not included in such grant as so set off shall be subject to the general land laws of the United States.*"

Nothing can be plainer than this language. It leaves no doubt as to its meaning. All the land not included in the grant as thus set off " shall be subject to the general land laws of the United States." The survey of the land confirmed is

VOL. CXV—8

withdrawn, therefore, from that special supervision and control which are vested in the Commissioner of the General Land Office over surveys of private land claims made under the act of 1864. The laws and practice of the Land Department, with respect to surveys of the public lands generally, only apply, and must govern the case. Had it been the intention of Congress to retain the special supervision of the commissioner, it is reasonable to suppose that the intention would, in some way, have been expressed. But there is nothing of the kind, and the survey is therefore to be treated as an ordinary official survey of the public lands, and, as such, is operative until changed or set aside by the Land Department. It is not necessary, as in the case of surveys of private land claims under other laws, to obtain the previous approval of such department before it becomes operative; and proceedings to acquire the title to lands outside of it may at once be taken either by the State or pre-emptors upon its assumed validity. Such was the view of the Interior Department with reference to the survey of the land confirmed here, after a most elaborate consideration. In illustration of the manner in which public lands, when once surveyed, can be disposed of, the Secretary refers to the act of Congress approved May 1, 1796, providing for the sale of lands of the United States in the territory northwest of the river Ohio and above the mouth of the Kentucky River. The Surveyor-General was authorized to prepare plats of township surveys, to keep one copy in his office for public information, and to send other copies to the places of sale and to the Secretary of the Interior. The present local land offices, said the Secretary, are equivalent to the places of sale mentioned in the act of 1796, and, as a matter of practice, from that day to the present time, the township plats prepared by the Surveyor-General have been filed by him with the local land officers, who thereupon have proceeded to dispose of the public lands according to the laws of the United States. There was nothing in the act of 1796, or any subsequent acts, which required the approval of the Commissioner of the General Land Office before the survey became final and the plats authoritative. Such a theory, said the Secretary, is not only contrary

to the letter and spirit of the various. acts providing for the survey of the public lands, but it is contrary to the uniform practice of the department. Applying this uniform practice to the case at bar, all doubt that the lands in controversy were open to selection by the State disappears. The grant was surveyed in February, 1868, and sufficient land set apart to satisfy it. In March following, a survey of the townships in which the land lay was made and approved by the United States Surveyor-General of the district, and in April the survey and township plats were filed in the land office of the district. . The State selections of lands lying outside of the survey of the grant were made before any action of the Surveyor-General was had recalling the plats and ordering a new survey. Had . his action been sustained by the Land Department, and the new survey made upon his order, which included the. land in. . controversy as part of the grant, been approved, a question would have arisen as to the validity of the selections in the face of such subsequent proceedings. It is not necessary to hold that they would have been unaffected. It may, perhaps, be that they would have had to abide the judgment of the department as to the status of the land. All that is necessary to decide here is, that, after the grant had been surveyed and the township plats filed, the State was at liberty to make selections from land lying outside of the survey, and pre-emptors were at liberty to settle upon it, and if the survey were not ultimately set aside, their rights thus initiated would be protected.

As already said, the Interior Department held the original survey valid, directed the township plats to be returned to the land office, and accepted the selections of the State outside of the survey and listed the land to her. The inchoate rights acquired to the lands selected were not lost by the subsequent action of the Surveyor-General in setting aside the first survey of the grant, and, after that action was vacated, could be perfected. The original survey, outside of which the selections were made, was approved by the Secretary of the Interior on the 31st of October, 1871, and the lands selected were listed to the State by the Commissioner of the General Land Office on the 29th of May, 1872, and by the Secretary of

the Interior on the 31st of the same month. The title of the State to the lands thus became as complete as though transferred by a patent of the United States. The statute declares that lists of lands granted to the State by a law of Congress, which does not convey the fee simple title or require patents to be issued, " shall be regarded as conveying the fee simple of all the lands embraced in such lists that are of the character contemplated by such act of Congress and intended to be granted thereby." It does not appear why the lands should have been listed by the Secretary of the Interior as well as by the Commissioner of the General Land Office, but it may have been because by the act of July 23, 1866, selections of indemnity school lands for the sixteenth and thirty-sixth sections, when lost in private grants, were to be approved by that officer. Having the title, there was nothing to prevent the issue by the State of her patent to the purchaser under whom the plaintiff claims. The land was not thereafter open to settlement and pre-emption, and the judgment must, therefore, be

*Affirmed.*

Good & Others *v.* O'Connor. In error to the Supreme Court of the State of California. Hazard & Others *v.* O'Connor. In error to the Supreme Court of the State of California. Each of these cases presents similar questions to those considered and determined in Frasher, *et al. v.* O'Connor, just decided, and on the authority of that case the judgment in each is *Affirmed.*