UNITED STATES, appellant, *v.* NORTHERN PAC. R. Co., respondent.

PUBLIC LAND — *Grant of alternate sections of unsurveyed lands to Northern Pacific Railroad Company — Grant in severalty.* — Under the grant of lands in the charter of the Northern Pacific Railroad Company, which provides " that there be, and hereby is, granted to said company every alternate section of public land, not mineral, designated in odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and providing for a survey of the land when the line of the road is located, previous to the survey of the lands the government and the company are not tenants in common, but the latter takes, from the date of the charter, a grant in severalty, to be applied to the subject-matter upon the fixing of the line of the road and survey of the lands.

EQUITY — *Account — Owners in severalty of undescribed parts of tract of land.* — Where a tract of land is owned, in ascertained proportions, by two persons, but the particular part of the land owned by each is not defined by application to the subject-matter, a suit for an accounting is not the proper method of determining the damage to the interest of one of the parties by the other cutting timber on the land, as they are not tenants in common, and it is impossible to tell on whose land the timber was cut.

*Appeal from Second District, Deer Lodge County.*

ROBERT B. SMITH, United States Attorney, for the appellant.

W. F. SANDERS, E. W. TOOLE, T. L. NAPTON and W. W. DIXON, for the respondent.

The United States has commenced this action against the Northern Pacific Railroad Company to compel an accounting and recover a sum of money by it alleged as due. This is not a case where the United States by its laws can dictate just such policy and decision as its representatives for the time being may desire, but is a case that must stand upon those principles of law and equity that every litigant in court is authorized to evoke. The relations of the government and the Northern Pacific Railroad Company stand upon a contract made between them, and which is found in the charter of the Northern Pacific Railroad Company and the amendments thereto.

The proposition being that the United States stands with its rights asserted and limited like those of any other party in court; whether it can maintain an action as for an accounting upon a portion of the unsurveyed lands in this grant. The court will take judicial notice of the law granting the land, of the construction of the road and of the surveys of the government. The charter and the cognate legislation constitutes a valid contract which is to be enforced, and the rights of the respondent defined thereby are to be protected as the rights of other parties are protected in the courts. See *Sinking Fund Cases,* 99 U. S. 700; *Wilmington R. R.* v. *Ried,* 13 Wall. 264–7; *Farrington* v. *Tennessee,* 95 U. S. 679; *Buttz* v. *N. P. R. R. Co.* 119 U. S. 55.

In such cases the United States, having appealed to the courts for a redress under such rules of equity as are administered in courts, stands like any other litigant and can invoke no principle of law or equity which is not the right of every party in court. There are no principles applicable

to it which are not the common right of all.   See *United States* v. *White,* 9 Sawyer, 125.

So far as is necessary for consideration in this case the following agreements extracted therefrom are quoted:

"That there be and is hereby granted to the Northern Pacific Railroad Company every alternate section of public land, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt."

"Section 6.   That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad."

These extracts from the laws of the United States and the decisions which have been made thereunder do not allow us to consider that it is an open question that the Northern Pacific Railroad Company owns the odd-numbered sections within the limits of its grant, and that ownership carries with it the concomitants of ownership, which are the rights of dominion over and to enjoy the possession and use of the thing owned.

There are some propositions involved in the questions presented by the demurrer which are fatal to the cause of action set up in the plaintiff's complaint.

1st.   There is no tenancy in common, because certain and specific parcels of land are conveyed to defendants by the grant which cannot be floated, but are limited and confined to the calls in the grant, and the beneficial interest in which was intended to be vested in defendant by its grant.   *Frederick* v. *Gray,* 10 Sargeant & Rawle, 187; *Fleming* v. *Kerr,* 10 Watts, 444; *Copp* v. *Beardsley,* 1 Vt. 151; First Series U. S. Digest, vol. 7, pp. 857, 858, 860; *Smith* v. *Powers,* 15 N. H. 546; First Series U. S. Digest, vol. 4, p. 542; 24 Vt. 583; 72 N. C. 106; *Patterson* v. *Trask,* 50 Am. Dec. 610; U. S. Digest, vol. 6, p. 232.

It is only where the calls of a deed or grant do not par-

ticularly define the boundaries, so as to confine it to a
particular tract, and a survey or evidence *aliunde* would not
specifically define the *locus in quo*, that a tenancy in common
exists.    And in all such cases the court in its opinion pro-
ceeds upon the assumption that if the calls of the deed or
grant so fixed the locality of the property as to confine it to
one certain place alone, then no tenancy in common existed,
as each owner would be entitled to every sprig of grass,
pound of ore and stick of timber on his own land and not a
particle on that of the adjoining owner.    *Schenk et al.* v.
*Evoy et al.* 24 Cal. 110; *Jackson ex dem. Gurnsey* v. *Liv-
ingston,* 7 Wend. 136; 29 N. Y. 572; 30 Vt. 735; *Fleming*
v. *Kerr,* 10 Watts, 444; *Lick* v. *O'Donnell,* 3 Cal. 59; *Corbin*
v. *Jackson ex dem. Gurnsey et al.* 14 Wend. 619; 12 Cush.
393; 26 Am. Dec. 668, note.    *Van Reynegan* v. *Boulton,*
95 U. S. 33, 36, and *Frasher* v. *O'Connor,* 115 U. S.
102, and authorities there cited, comprise movable sales
within Mexican grants, and involve dissimilar questions to
those presented above.

So it is with the balance of the authorities, 37 Califor-
nia, 30 American Decisions, and Kent's Com., cited by the
learned counsel for the government.    The questions all turn
upon the point we have suggested.    Besides, a conveyance
by one tenant in common of a specific portion of the com-
mon property is void, at least in so far as it attempts to
sever the property, and it is absurd in the extreme to say
that a conveyance of certain parcels of land to A. and cer-
tain other parcels to B. would create such a tenancy.    Free-
man on Co-tenancy and Partition, 199 *et seq.;* 24 Pick.
529; 10 N. H. 242; 3 Yerger, 492; 5 Conn. 363; 28 Texas,
34; 13 Mass. 384; *Gates* v. *Salmon,* 35 Cal. 576; 24 Me.
482; 48 N. H. 347, and authorities cited in note, p. 188 *et
seq.,* in Freeman on Co-tenancy and Partition.    It seems
clear that the calls of the grant do not *ipso facto* create a
tenancy in common, and the great inconvenience attending
such a relation was certainly never contemplated by the
government.    Such a conclusion cannot be reached from

the letter of the law, or inferred to be the intention of the parties. The reasons are all against such a result.

2d. It is clear from the authorities, where the statute of Anne is not in force, or the relation of bailiff is not created by express contract, that one tenant in common is not liable for the labor and expense in improving and utilizing the common property, 12 Cal. 441; 9 Pick. 34; 16 In. 518; 12 Mass. 152, 153, 158; 19 Am. Dec. 264; Jacob Fisher Dig. vol. 1, p. 37; 21 T. I. 2 B. 82.

It is also clear from the grant that while defendant and plaintiff may have such a common interest in the property until a survey is made as to enable them or either of them to protect it against a stranger, nevertheless plaintiff is in fact entitled to no beneficial interest in the odd sections. The right to so preserve the property arises from the peculiar condition, not character, of the title.

Hence if the statute of Anne is not in force there are no circumstances of complication or other reason why a court of equity will take jurisdiction. A survey relieves it of every quality involving the necessity of an accounting, if any ever existed; this plaintiff agreed to do,—it is its duty to do so.

This default of plaintiff in not making the survey may give it a great advantage in receiving a moiety in the timber cut. A court of equity will not permit this. It cannot come into a court of equity saying that I have it in my power to define the exact rights of the parties; I am the only one that can do so, and it is my duty to do it, but I desire to take my chances in an accounting. It can have no standing in a court of equity, when it is plain that by its own default it has occasioned a complication by which it may be the gainer. By defining the respective rights of the parties in the survey it permits respondent to know its own and enjoy and occupy the same. Story's Eq. Jur. 84, c, d, e; 72 Mo. 403; Haines on Jurisdiction, 71; 6 Paige, Ch. 570; 17 Fed. Rep. 561, title Equity; 30 Minn. 219.

3d. Had a survey been made before the entry by de-

fendant, the measure of plaintiff's right would be the quantity of timber cut from the even sections and none other; trover would be its remedy. Sedgwick and Wait on Trial of Title to Land, top p. 435; Freeman on Co-tenancy and Partition, 375, bot. p. 96, 307 and 308.

In an accounting it is necessary to ascertain its just portion of the trees or timber cut. This can only be ascertained by a survey. But assuming that the parties are tenants in common as alleged, and that the plaintiff is entitled to the half of the timber on the odd sections and defendant to its half of the timber on the even sections (which we deny), then how stands the case? The parties are tenants in common in the unsurveyed lands from Lake Superior to Puget Sound. Each is entitled to an account for what it has taken from the common property. It is nowhere alleged that plaintiff has taken none. And yet it selects out about twenty miles along the entire route (where forsooth defendant has cut and it has not) and asks for an accounting for that alone. Such a proposition is too monstrous to be entertained for a moment. It neither defines its just share or comprises the necessary subject of the action. Now the rights of these parties were definitely fixed upon the location and construction of the road in 1882, and they must be determined by the condition of things at the time of the alleged trespass or taking of the timber in 1883, '84 and '85, and at the time of bringing this action. The right of defendant fastened itself upon these odd sections in 1882, and the plaintiff has no beneficial interest in them. All that can be said is that it retains a lien upon them until the costs of surveying is made. Hence it is idle, we say, to talk of the accounting here sought on account of any such relations as tenants in common.

4th. Subdivision 3 of the complaint, which attempts to present the gravamen of this action, does not show that the timber taken was not taken or sold to be used and would not be used in the construction of the road. The defendant had a right under its charter to take timber, etc., from

any of this land for construction purposes, and could sell
and dispose of it to the person or company having the con-
tract for construction.   The law supposes that they did
this, and until the contrary is alleged there is no case made
by the bill.

As to the injunction, there was no good cause for its is-
suance, and can be no pretext for its continuance.   The
lands are timber lands, and their value consists in the utili-
zation of it.   In such case the authorities all concur in the
doctrine that it is not waste for one co-tenant to cut and
utilize this timber, and that he is exercising simply a right
when he does so.   If this is correct and according to the
allegations, he is answerable to his co-tenant for his just
share; some element must enter into it to give the court
jurisdiction to enjoin.   If there is no waste, insolvency
alone (if it could) would warrant the court in granting an
injunction.   Waste is not committed and insolvency is not
alleged.   The injunction should be dissolved.   Freeman on
Co-tenancy and Partition, 299, 323, 324, and authorities;
*McCord* v. *Oakland Q. M. Co.* 64 Cal. 134 *et seq.*

While there may be reasons for permitting either party
under such circumstances to protect, the property from
waste or damage by a stranger, no reasons exist for the
maintenance of this action.

If plaintiff could enjoin defendant, defendant could in
turn enjoin plaintiff, and the common property would
thereby be rendered valueless.   No partition is sought, and
this condition of things might continue forever for aught
that appears.

Recurring again to the first proposition presented by this
brief, we respectfully submit the following:   The principles
applicable to the confusion of goods seem to bear great anal-
ogy to those involved in this case.   Where there has been
a confusion of goods without the fault of either party, and
a separation cannot be had, a tenancy in common is thereby
created in the whole.   Where the confusion occurs by the
fault of either party, and a separation cannot be had, the

party in fault loses his part of the goods so confused.    In either case, where it is within the power of either party to identify his property, it is his duty to do so, and thereby avoid the complications that attend a tenancy in common, or the loss that would otherwise ensue.    This tenancy, if existing, is created from the very necessity of things and is based upon the sole theory that identification and separation cannot be had.    As, therefore, the prime right of the party consists in securing his own, the duties and remedies that are incident to it must first be invoked.    If the party is an actor and has it in his power to make that certain, the uncertainty of which causes inconvenience and complication, it is his duty to make it certain.    Plaintiff, besides being armed with exclusive authority to make a legal survey of the lands, has by its contract under the charter assumed the duty of doing so, and thereby designate the particular property to which each is entitled, and afford to the injured party a plain and speedy legal remedy.    These principles, it seems to us, apply with special force and aptness to this case on account of the relations and duties arising out of the contract between the parties.    Plaintiff cannot invoke inconvenient methods of litigation when it can be avoided, at the expense of some inconvenience to itself.    More especially is this so when plaintiff by its contract is in default, in not performing the very act that would have avoided the occurrence of such inconvenience and would completely remove the same.    See Freeman on Co-tenancy and Partition, secs. 95, 96.

But the learned counsel for the United States proceeds upon the presumption that if the United States and the defendant are tenants in common of the eighty-mile tract, and the statute of Anne is in force in the territory of Montana as to ordinary tenancies in common, the plaintiff is entitled to recover.    This proposition we deny.    An action of accounting is equitable in its nature, and regard must be had to the situation of the parties before determining what responsibility one incurs to the other by a use of the estate

or by receiving from it rents and profits. It cannot be denied that when the appellant shall fulfill its contract with the respondent, which it has broken heretofore, it may by that fulfillment be ascertained that there has been no occupancy of or receipt of rents and profits from any lands which do not belong to the respondent, or which belong to the United States, and the recovery of money for such occupancy or receipt might be a recovery to which the plaintiff was not entitled, and the respondent, when that fact was ascertained, would be without means of redress. The rule holding tenants in common to an accounting is not an arbitrary one to be inexorably applied, but is based upon liabilities which grow out of the ordinary relation of tenants in common, and not out of the extraordinary relation of tenancies which arise by confusion or dereliction of one of the parties. The reason of the rule fails, and *Cessante ratione legis, cessat ipsa lex.*

Doubtless a temporary tenancy in common by the fault of neither would make the tenant liable for temporary rents and profits received by him beyond his fair share, but that a temporary tenancy in common arising from a confusion of the property, and which is to terminate at an early day by the partition, would make one liable for permanent waste when the partition might show that that injury was made wholly on land belonging to the party committing the waste, is in defiance of equity and reason. It is not every tenancy in common that authorizes an action by one of the tenants against another for an accounting; and to this effect are the authorities. See *Ross* v. *McJunkin,* 14 Sergeant & Rawle, 364.

Ordinary tenants are equally responsible for non-partition; the rights of the tenants in common as between themselves are suspended, and it is a much stronger case where the blame for the non-division of the estate is wholly upon plaintiff, as in this case. Where one tenant compels another, in order to enjoy his estate, to remain in ignorance of the lines there over, and thereby produces a confusion of

property, the tenant that is blameless will be held not liable for attempting to enjoy the profits of its estate. Even in the cases cited there are certain elements of a tenancy in common wanting, and courts have named the relation such for want of a better definition. It is a tenancy arising from confusion, a relation in this case compelled by the appellant in violation of its agreement, and if it should be misnamed a tenancy in common, it would be so *ex necessitate rei*, lacking the elements making the respondent liable to account.

The attempt of the plaintiff to erect or magnify its violation of its contract to survey into a condition precedent of the grant, or thereby to deny the defendant the enjoyment of the property granted, is inequitable and contrary to law.

WADE, C. J. This is an action instituted by the United States, the appellant, against the Northern Pacific Railroad Company, the respondent, for an accounting, and to recover the sum of $1,100,000 for certain timber, logs, and lumber, which the appellant alleges were cut, taken, converted and carried away by the respondent during the years 1883, 1884, and 1885, from certain non-mineral unsurveyed lands belonging to the appellant and respondent, as tenants in common, situate in the territory of Montana, between the western line of said territory and McCarthy's bridge, over the Hell Gate river in Deer Lodge county, and on either side of the line of the railroad of the respondent, and not more than twenty miles distant therefrom, and for a perpetual injunction enjoining the respondent from cutting or removing timber from said unsurveyed lands, held by the appellant and respondent as such tenants in common, and from injuring, wasting or disposing of the same. The court below sustained a demurrer to the complaint, and the appellant abiding the same, judgment was rendered for the respondent, from which the plaintiff appeals to this court. The foundation of appellant's action rests upon the proposition — *First*, that the United States and the Northern Pacific Railroad Company are tenants in common of the

lands from which the trees and timber in question are alleged to have been taken, and *second*, that an accounting, as between such tenants in common, is a proper remedy.

1. Whether the relation of tenants in common exists between these parties depends upon the provisions of the act of congress which gave to the respondent company life, and the rights and relations thereupon arising. The charter of the Northern Pacific Railroad Company is not only a law, but is also a contract, binding alike upon both parties, and giving to each certain rights and imposing upon each certain obligations, which rights thereby become vested, and which obligations cannot be escaped or avoided. There was ample consideration for this charter and contract. The railroad in contemplation was of national importance. The purpose of the government in entering into this contract and in granting this charter was to promote the public interest and welfare by causing this road to be constructed, thereby to secure to the government at all times the use and benefits of the same for postal, military and other purposes. Charter, § 20. But congress recognized the fact at that time (1864) patent to all the world, that a railroad and telegraph line from Lake Superior to Puget Sound by the northern route could not be built through the then uninhabited regions between these points by mere private enterprise, and hence the "Act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific coast by the northern route." The purpose of this act, as its title clearly indicates, was to *aid* in the construction of the road, in consideration of the benefits which the government would derive by such construction, as the provisions in its various sections clearly indicate. The scope and extent of the grant, the amount of aid which the government, for this purpose, saw proper to contribute to this enterprise, is found in section 3 of the act incorporating the company, wherein it is provided "that there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for

the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railroad, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office, and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections and designated by odd numbers, but not more than ten miles beyond the limits of said alternate sections."

The words, "that there be, and is hereby, granted," are words of present grant, and took effect at the date of the act of congress. A grant of lands by the government is equivalent to a deed in fee.

In the case of *Northern Pac. R. Co.* v. *Majors,* 5 Mont. 145, after a review of the authorities in deciding upon the effect and meaning of these words, and of the act incorporating the Northern Pacific Railroad Company, this court said: "Our conclusion, therefore, both upon reason and authority, is that the title of the respondent [the Northern Pacific Railroad Company] took effect at the date of the approval of the act of congress; that the location of the route and the survey of the lands gave precision to the title and caused it to attach to the particular sections as of the

date of the approval of the act, as fully as if such particular sections had been designated in the act; that the character of the title is that of a grant upon condition subsequent, and that the office of the patent is to confirm the title, as certain designated portions of the road are completed and reported upon by the commissioners, and render it absolute and unconditional."

The location of the definite route of the road, and the survey of the lands, anchored the grant, and attached it to its proper subject-matter. But before the definite location and survey, and by the location of the *general* route of the road, by operation of law,— by a provision of the act itself,— the lands embraced within the limits of the grant, both as to the odd and even sections,— both as to that granted to the company, and as to that retained by the government,— were withdrawn from sale, entry, or preemption, and as to that granted to the company, this withdrawal continued both before and after survey, and as to that retained by the government until after survey.

Section 6 of the act provides "that the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or pre-emption, before or after they are surveyed, except by said company, as provided by this act, but the provisions of the act of September, 1841, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled ' An act to secure homesteads to actual settlers on the public domain,' approved May 20, 1862, shall be, and the same are hereby, extended to all other lands on the line of said road, *when surveyed*, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a price less than $2.50 per acre, when offered for sale."

The latest expressions of the supreme court of the United

States upon the subject of this grant to the Northern Pacific Railroad Company, and when the same became operative, are found in the case of *Buttz* v. *Northern Pac. R. Co.* 119 U. S. 55 (decided at the October term of that court, 1886), in which it is declared that, " at the time the act of July 2, 1864, was passed, the title of the Indian tribes was not extinguished. But that fact did not prevent the grant of congress from operating to pass the fee of the land to the company." In the same case it is further held that, " when the general route of the road is thus fixed in good faith, and information thereof given to the land department, by filing the map thereof with the commissioner of the general land office or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections, to the extent of forty miles on each side. The object of the law in this particular is plain — it is to preserve the land for the company to which, in aid of the construction of the road, it is granted."

Nearly one year previous to this decision, the supreme court of Montana, in the case of *Northern Pac. R. Co.* v. *Lilly,* 6 Mont. 65, had said, in speaking of the effect and operation of section 6: " This section is itself a grant, and a legislative reservation and withdrawal of the lands granted from sale or pre-emption, except by the company. . . . This land is reserved from sale by congress. It is a legislative reservation, and takes effect whenever the general route of the road is fixed; and thereafter no person could acquire any right or interest in the land reserved from sale, except by act of the company, the grantee of the government." Thus, as to the alternate sections within the limits of the grant, designated by odd numbers, the title passes from the government to the company. But as to the lands within the limits of the grant reserved by the government, being the alternate sections, designated by even numbers, they cannot be offered for sale until they are surveyed. The provisions of section 6 are that the reserved sections cannot be sold, and are not subject to the operation of the homestead or pre-emption laws, until they are surveyed.

This, then, was the condition of the title to the lands upon which the logs and timber in question were cut: The general and definite route of the road had been fixed; indeed, the road had been constructed, and was in operation through and over the lands. The land was unsurveyed. The government was the owner of the reserved even sections, but could not sell them; and the company was the owner of the odd sections, and such sections were not subject to sale except by the company; but the respective sections had not been surveyed, and thereby designated. Did this condition of title create a tenancy in common in these lands as between the government and the company? Each as to the other was the owner of the alternate sections, and all that remained to be done was to have the sections numbered. The government owned no interest in the lands that had been granted to the company; and the company owned no interest in the lands reserved by the government. As between these parties there was no undivided joint ownership in these lands. The interest of the company was a several, separate interest, and so was that of the government. Neither could acquire any interest in the whole under a grant of a part. Neither could acquire a joint interest in all the sections by a several and separate grant to or reservation of the alternate sections to each. The company owned the entire interest in every tree or stick of timber on the lands conveyed to and embraced within its grant; and the government had the same interest in the lands reserved to itself. Neither the government nor the company could sell their lands, and neither could demand partition; for neither owned any undivided interest in the lands of the other. The grant to the company had already partitioned the lands granted, and it only required a survey — an extension of lines — to show the section boundaries; and this survey the government had promised to make as fast as required in the construction of the road.

What are the incidents of a tenancy in common in lands? There must be a joint undivided interest in the entire tract.

In the case of *Ross et al.* v. *McJunkin et al.* 14 Serg. &
R. 364, land warrants had been issued to John and William
Menough,— to John for three hundred acres, and to Will-
iam for two hundred acres,— which had been surveyed to-
gether, and a general diagram of survey returned, which
contained no division line, nor anything to distinguish the
one tract from the other.   The parties to this action, which
was ejectment, derived their titles respectively from John
and William Menough; and Gibson, J., speaking for the
supreme court of Pennsylvania, said: "The nature of the
interest which the original owners of the warrants held
under their joint survey will go far to settle the rights of
the parties before us. .They were grantees from the state,
not of an undivided interest in the whole, but of separate
and distinct parts of the whole; consequently, they were
not tenants in common.   The grant to the one would not
have entitled him to possession in common of the whole;
nor, if one had been disseized, could he have recovered an
undivided portion from the other.   The truth is, the sur-
vey was imperfect; and, although a valid appropriation of
the land to strangers, it left their rights, as between them-
selves, suspended till the subject of the grant to each should
be specifically designated by the proper officer or by them-
selves.   It has been held that any number of warrants may
be surveyed together by a common outline, so as to prevent
a valid appropriation of a part of the land included to subse-
quent warrants; and, it being a matter between the war-
rantees themselves, I can see no difference whether the
interior lines be laid down by protraction or not.   But the
separate owners of warrants thus laid would certainly not
have an interest in common in the lands included in the gen-
eral survey.   Tenants in common, although their estates be
several, have each an undivided interest in the whole; but
it can with no propriety be said that each has an interest in
the whole under the grant of a part."   And with equal
propriety it might be said, as to the railroad company, that
it is a grantee from the government, not of an interest in

the whole tract eighty miles in width along the line of
the road, but of separate and distinct parts of the whole;
that the grant to the company did not entitle it to possession
in common of the whole; that if it had been disseized, it
could not have recovered an undivided portion from the
government of the lands reserved; that the grant to the
company of the alternate odd sections, and the reserva-
tion to the government of the even sections, left their rights,
as between themselves, suspended till the subject of the
grant to each should be specifically designated; that these
separate owners of separate sections do not have an un-
divided interest in common in the whole tract; and that the
company acquired no interest in the whole by the grant of
a part.

This is not at all in conflict with the opinion of the su-
preme court of the United States, delivered by Justice Field
in the case of *Frasher* v. *O'Connor*, 115 U. S. 107, so much
relied upon by appellant. In that case the court says: "A
very great portion of the lands in that state (California)
were covered by Mexican or Spanish grants. Some of the
grants were by specific boundaries, and the extent of the
land covered by them could be readily ascertained without
an official survey. But by far the greater number were of
a specific quantity of land lying within out-boundaries em-
bracing a much larger quantity. Thus, grants of one or
two leagues would often describe the quantity as being
within boundaries embracing double or treble that amount;
the grant declaring that the quantity was to be surveyed
off by officers of the vicinage, and the surplus reserved for
the use of the nation. The grantee in such case was, of
course, entitled only to the specific quantity named; but what
portion of the general tract should be set apart to him could
only be determined by a survey under the authority of the
government. Until then the grantee and the government
were tenants in common of the whole tract. No one could
intrude upon any portion of it, the whole being exempted
from the pre-emption laws. The practical effect of this

condition in many cases was to leave the grantee, until the official survey, in the possession, use and enjoyment of a tract of land containing a much larger quantity than that granted."

The sense in which the grantee and the government are, in this decision, said to be tenants in common, is that the separate share of each had not been set off. There is no intimation that the grantee of a part thereby acquires an undivided interest in the whole, or that the share of each might have been ascertained by a partition. Tenants in common though their estates be several, have an undivided interest in the whole, and can acquire no such interest by the grant of a part.

In the case of the Mexican grant, it required an act of congress to compel the share of the grantee to be surveyed and designated, which would have been wholly unnecessary and useless if the government and the grantee had been tenants in common. If they had been tenants in common, in a legal sense, no survey would have been necessary; for, in that case, they would each have owned an undivided interest in the whole tract. Merely extending a survey over a tract held by tenants in common would not designate the shares of each. It would only ascertain and number the sections in which they had a joint undivided interest. And the fact that a survey would ascertain and designate the acres or the sections that belong to the grantee and those that belong to the government, and that the interests, when so ascertained, are several, and not joint, is conclusive that property so held and owned does not cause its owners to become tenants in common.

Section 6 requires the government to cause the lands granted to the company to be surveyed as they shall be required in the construction of the road. The force of this requirement is not affected by the act of July 15, 1870 (16 Stat. at Large, 310), which provides that, before any lands granted to the company shall be *conveyed* to any party entitled thereto, there shall be first paid into the treasury of

the United States the cost of surveying, selecting and conveying the same by the company or party in interest.    This merely provides that, before the lands shall be *conveyed* by the company to any party, the company shall pay the costs of *survey*, etc.; but this does not do away with the duty of the government to cause the lands to be surveyed.    They must be surveyed before they can be sold or conveyed.    It is the plain duty of the government to cause these lands to be surveyed, and then, under the act of 1870, to prohibit any sales or conveyances by the company, or the issuance of any patents to it, until it has paid the costs of such survey.    If the lands had been surveyed as required by section 6, then no question could have arisen between the government and the company as to the ownership of trees and timber upon the lands included within the boundaries of the grant.    And the government cannot make its failure to perform this duty the foundation of an action against the company, which a survey in accordance with the requirements of section 6 would have rendered impossible.    The construction of the road required this survey, thereby, if for no other reason, to have rendered such an action as this, or kindred actions, unnecessary and impossible.    It required a survey to the end that the rights of the government and the company be clearly defined and properly understood.    It required a survey that the pre-emption and homestead laws might be applied to the alternate even sections along the line of the road, and to enable the government to sell such sections.    This survey, rendered necessary by the construction of the road, was not required simply for the benefit of the company, but also for the benefit, advantage and protection of the government and its property.    When the survey shall take place is not within the discretion of the company.    The construction of the road, and as fast as it is constructed, puts these provisions of section 6 in motion, and requires the survey to be made.    It was not intended that, if the land granted to the company was not required in the construction of the road, it should never be surveyed.

Now, if these parties could be held to an accounting, each being the owner in severalty of parts of the unsurveyed lands, but which parts had not been designated, and neither having an undivided interest in the whole tract, how could a just and true account be stated, and the parties correctly charged for trees and timber taken from such lands? It would be utterly impossible to ascertain from whose lands they were taken. The very first inquiry would be whether the trees and timber had been taken from the lands of the company or from that belonging to the government. The fact that these parties own their shares or parts in severalty, and that they have no undivided interest in the entire tract, would suggest this inquiry at the outset; but the question could not be answered by anything short of a survey and designation of the sections. Suppose an accounting should be decreed, and the company made to pay for one-half the trees and timber taken from the unsurveyed lands described, and then, when these lands came to be surveyed, and the sections designated, it should be found that the company had taken trees and timber only from its own sections. We do not think an accounting would be proper, when the damage and injury liable to be occasioned thereby would require another action or an act of congress to remedy it. On the contrary, if it should be shown that all the trees and timber in question had been taken from the sections belonging to the government, then, under this action, wherein the government only claims as a tenant in common, it could recover for only one-half of the value of such trees and timber, and would lose the other half; and what is lost the company would gain.

A survey of the lands, which the government ought to make, would show the exact rights of the parties, and then an accounting would be improper and unnecessary. And the government cannot lawfully demand an injunction until it can be shown that its property is being injured, or that injury is threatened; and this cannot be shown until the lands are surveyed and the sections designated. Then ac-

tions in the nature of trespass or trover would be the remedy of the government for trees taken or converted by the company.

The judgment is affirmed, with costs.

BACH, J., concurs.

McLEARY, J. (*concurring*). I concur in the opinion of the court for the following reasons, briefly stated: The act of congress of 2d of July, 1864, did not grant to the Northern Pacific Railway Company one-half of a certain tract of land eighty miles in width, of which the railroad track is the center line, through the territory of Montana, as seems to have been the theory of the United States district attorney in framing this complaint. But there were granted to the Northern Pacific Railroad Company the alternate sections, to be designated by the odd numbers, in an area extending forty miles on each side of the railroad track, as it runs through the territories. This did not create a tenancy in common. No interest whatever was ever granted to the railroad company in the even-numbered sections. The title therein remained in the government. Then, as soon as the route was located and surveyed, and the map thereof was filed with the commissioner of the general land office or the secretary of the interior, and not before, the grant from the government took effect, and attached to the specific parcels of land known as odd sections, lying on each side of the established route. And these even-numbered sections were easily distinguished. In fact, they were already known; for, before the building of the railroad, as this court judicially knows from current history, the base line and the principal meridian of Montana, and the initial point, had been long since established, and the several townships ranked themselves in place on the ground. They had their several locations in ranges north and south of the base line, and east and west of the meridian, and these designations were already determined. And in the same

manner each section in each township was known by its number as well then as it ever was, or ever would be. The general land office, years before the territory of Montana was set apart from the public domain, had established the present system of designating townships and numbering sections. The sixteenth and thirty-sixth sections in each township had long before been set apart by legislative enactment for the benefit of public schools. And the setting apart of these odd sections for this railroad company was done in the same manner. It is true, they could not be exactly identified on the ground itself until a survey had been made; but this fact does not in the least affect the title. There were the initial point, the base line, the principal meridian, and the railroad track, from which all measurements must be made; and any surveyor could take a chain and transit and mark every corner of every tract belonging to the railroad company. For this reason, also, there was no tenancy in common. But the railroad company owned these lands, as it does now and always has, in severalty; and the United States still holds the title to the even-numbered sections, which were never in any way affected by the railroad grant. I do not fully approve the decision in the case of *Northern Pac. R. Co.* v. *Majors*, 5 Mont. 111, as to the time at which the grant of the lands to the company attached to the particular tracts.; but, as far as it is quoted as an authority in this case, it meets my approval.

The true rule, as it seems to me, fixing the time when this grant attached to the particular lands, is set forth in the case of *Buttz* v. *Northern Pac. R. Co.* 119 U. S. 55 (decided at the autumn term, 1886), by the supreme court of the United States; and in this particular it appears to conflict with the case of *Northern Pac. R. Co.* v. *Majors*, above cited. In all other particulars I fully concur in the opinion of the court herein rendered.